OPINION
{¶ 1} Defendant-appellant, Michael D. Walters, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of one count of murder and one count of felonious assault. Because the trial court properly denied defendant's motion to sever, because sufficient evidence and the manifest weight of the evidence support defendant's convictions, and because defendant was properly sentenced, we affirm. *Page 2 
 {¶ 2} By joint indictment filed June 17, 2005, defendant and William Dustin McKenzie each were charged with one count of murder in violation of R.C. 2903.02(B) and one count of felonious assault in violation of R.C. 2903.11, all arising out of the death of Richard J. Strojny following a June 7, 2005 incident. On November 22, 2005, defendant filed a motion to sever his trial from that of McKenzie; on January 30, 2006, the trial court denied defendant's motion.
 {¶ 3} The defendants were jointly tried by jury in May 2006. The jury found defendant guilty as charged in the indictment and McKenzie guilty of assault as a misdemeanor of the first degree. The trial court sentenced defendant to a term of 15 years to life for the offense of murder and a consecutive term of five years for the predicate offense of felonious assault.
 {¶ 4} Defendant timely appeals, assigning eight errors:
 FIRST ASSIGNMENT OF ERROR
 The trial court erred in failing to sever the trials of the co-defendants, who presented mutually antagonistic defenses and were prevented from fully defending against the allegations because of the joint trial.
 SECOND ASSIGNMENT OF ERROR
 The trial court erred in failing to grant a defense request for a continuance because of the failure of the prosecution to provide discoverable material as required by Crim.R. 16 and Brady v. Maryland (1963), 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194.
 THIRD ASSIGNMENT OF ERROR
 The trial court erred in entering a guilty verdict on the charge of felony murder as R.C. 2903.02(B) expressly provides that *Page 3 
the statute is inapplicable when the defendant can be charged with involuntary manslaughter.
 FOURTH ASSIGNMENT OF ERROR
 The trial court improperly excluded evidence of a rape allegation against the co-defendant that was the basis for the argument that led to the victim's death. The evidence was relevant and material to Appellant's defense.
 FIFTH ASSIGNMENT OF ERROR
 The trial court improperly castigated defense counsel and threatened to take disciplinary action against him in the presence of the jury and in a manner that prejudiced Appellant.
 SIXTH ASSIGNMENT OF ERROR
 The trial court improperly permitted the prosecutors to stage an impromptu re-enactment in the courtroom to prove that Appellant's version of events was not believable. This re-enactment made the prosecutors['] witnesses in violation of the Rules of Professional Responsibility and lacked foundational support to establish that it was a truthful and reliable re-enactment.
 SEVENTH ASSIGNMENT OF ERROR
 The trial court erred in sentencing Appellant to consecutive terms for the offenses of felonious assault and felony murder premised on felonious assault, in violation of the double jeopardy protections under the state and federal Constitutions.
 EIGHTH ASSIGNMENT OF ERROR
 There was insufficient evidence to support the guilty verdicts by proof beyond a reasonable doubt and those verdicts were against the manifest weight of the evidence, thereby, depriving Appellant of due process protections under the state and federal Constitutions.
Due to the nature of the assigned errors, a detailed recitation of the facts is appropriate. *Page 4 
I. Facts {¶ 5} Defendant, McKenzie, and Richard Strojny ("Strojny") lived in the same neighborhood. The three men, along with other neighbors, often socialized and frequently engaged in "horseplay" while drinking. The "horseplay" often included McKenzie placing someone in a headlock.
 {¶ 6} Around noon on June 7, 2005, defendant and McKenzie began drinking as they worked on McKenzie's car. Over the course of the afternoon and early evening, Strojny and another neighbor, Dave Corfman, joined the group. At some point, defendant put his hand in Strojny's face; in response, Strojny twisted defendant's injured arm. When Strojny did not heed defendant's request to be released, defendant became angry and challenged Strojny to a boxing match. Defendant cursed and boasted to Strojny that he would "kick his ass," "fucking kill [him]," and put [him] down in three punches." (Tr. 1004-1005, 1386, 1530.) McKenzie intervened and diffused the situation. Corfman returned home; Strojny, defendant and McKenzie eventually walked to Strojny's house, where they continued drinking.
 {¶ 7} The events precipitating Strojny's death occurred in the front yard of Strojny's home sometime after 10:00 p.m. the same day. According to defendant's account of events, McKenzie and Strojny began arguing about an "incident" that occurred several months earlier concerning Ashley, the girlfriend of Strojny's son Nicholas. (Tr. 1395.) As the argument intensified, Strojny poked at McKenzie. After McKenzie smacked Strojny's hand away, Strojny punched McKenzie in the head. McKenzie jumped on Strojny's back and put him in a headlock. With McKenzie still on Strojny's back and his *Page 5 
arm around Strojny's neck, the two fell to the ground and rolled down an incline onto the driveway. When Strojny attempted to stand up, he lunged forward. He and McKenzie hit the car parked in the driveway, and the two fell down on the driveway between the car and the concrete. According to defendant, Strojny, still in McKenzie's headlock, was down on one knee with his foot against the bottom step. He was trying to break the headlock by pressing McKenzie's body into the side of a car parked at the bottom of the steps at the edge of the driveway.
 {¶ 8} McKenzie called to defendant to get Strojny off him. Strojny, however, attempted to free himself by flipping McKenzie over his head. McKenzie and Strojny, still in the headlock, spun in a full circle and fell down toward the steps. According to defendant, Strojny's head "hit the steps." (Tr. 1483.) Strojny then "popped up" and almost "tackled" defendant, causing defendant and Strojny to fall into the steps. Id. at 1410-1411. As a result, defendant's leg was pinned under Strojny. After defendant freed himself, he noticed Strojny lying motionless on the driveway. "[S]cared, and in a panic and drunk," defendant told McKenzie they both should leave the area. Id. at 1414. Defendant stopped briefly at his house and then went with a neighbor to a fast food restaurant.
 {¶ 9} According to McKenzie's version of the events, while he, Strojny, and defendant drank and talked in Strojny's front yard, the conversation turned to arm wrestling and body building. Strojny and defendant teased McKenzie about his relatively small stature, because at 5'9" and 170 pounds, McKenzie was much smaller than either 6', 240-pound defendant or 6', 305-pound Strojny. Strojny grabbed McKenzie's arm and pulled it behind him. McKenzie freed himself, jumped on Strojny's back, and put him in a *Page 6 
headlock. McKenzie estimated that Strojny was in the headlock for only five to ten seconds. McKenzie, however, admitted that during the headlock he could not touch the ground, so his full body weight was hanging from Strojny's neck. Upset, Strojny flipped McKenzie over his head. McKenzie landed on his back. Strojny straddled him and punched him in the face; McKenzie retaliated, punching Strojny in the face. When McKenzie attempted to roll away, he ran into Strojny's leg, and Strojny fell on McKenzie. The two rolled down the incline onto the driveway where the car parked on the driveway halted their momentum. According to McKenzie, Strojny was no longer in the headlock, and the fall did not cause Strojny to hit his head on the concrete steps.
 {¶ 10} At this point, McKenzie was pinned under Strojny. Defendant ran down the hill and twice kicked Strojny in the head "[l]ike if you're kicking a football." (Tr. 1544.) In all, defendant kicked Strojny more than five times. Defendant then straddled Strojny and punched him 20-30 times in the back of the head. McKenzie heard "one good hit" and Strojny fell like "dead weight" onto McKenzie. Id. at 1545. According to McKenzie, the punch "knocked [Strojny] out cold." Id. at. 1546.
 {¶ 11} McKenzie yelled to defendant to get Strojny off of him. Defendant grabbed Strojny's shoulders and pulled him backward and "threw him up there * * * towards the steps." (Tr. 1547.) Strojny landed on his back with his head on the bottom step where defendant stomped and kicked Strojny's head and chest. McKenzie told defendant to "quit kicking him in the * * * head, he's not moving." (Tr. 1549.) Defendant left the scene. McKenzie observed that Strojny rolled from the steps onto the driveway and was motionless and nonresponsive. *Page 7 
 {¶ 12} Two neighbors, Bettina Worboy and Tonda Harris, witnessed part of the incident. According to Bettina, she was sitting on the front porch of her house and saw defendant, McKenzie, and Strojny drinking and talking loudly in front of Strojny's house. She heard McKenzie apologize to Strojny and say he just wanted to tell Nicholas he was sorry. At some point, McKenzie put Strojny in a headlock for 10-20 seconds, and Strojny fell to his knees. Bettina assumed the men were just goofing around because they were intoxicated. Bettina went inside her house for a short time, and when she returned outside she overheard McKenzie say, "Mike get him off me." (Tr. 680.) She heard a "pounding" noise that she described as a "bone crunching sound." Id. She ran toward Strojny's house and heard McKenzie say, "Mike, quit kicking him in the head, man." Id. At trial, Bettina admitted she told police McKenzie said, "Mike, stop kicking him," but she was adamant at trial that McKenzie implored defendant to stop kicking Strojny "in the head." Id. at 702-705. As defendant left the area, he noticed Bettina and said "[y]ou bitch, get back, I'll get you, you bitch." Id. Bettina perceived the comment as a threat. Id. at 682.
 {¶ 13} Tonda testified she returned home sometime after 10:00 p.m. and heard a commotion at Strojny's house. Bettina called to her from across the street. As Tonda walked toward Bettina, she noticed Strojny lying on the ground. McKenzie was kneeled down, punching at something; defendant was aggressively "stomping" at something. (Tr. 374.) Tonda retrieved her cell phone from her car and called 9-1-1. When she returned, defendant was not at the scene, but McKenzie was attempting to help Strojny. McKenzie was upset and reported that Strojny kicked him in the face; he did not mention defendant. *Page 8 
 {¶ 14} A short time later, Bettina found Strojny lying on the driveway close to the steps. His head was enlarged and his ear was bloody and distorted. One of the steps had blood and hair on it. Bettina's husband, Bryan, noticed the activity at Strojny's and came across the street to investigate. McKenzie was crying and said he tried to help Strojny. Bryan awakened Nicholas, who was asleep in the house, and reported that his father was badly beaten. Nicholas, Bryan, and McKenzie carried Strojny from the driveway into the front yard and waited for an ambulance to arrive.
 {¶ 15} Law enforcement personnel arrived at the scene and interviewed several witnesses. An officer asked McKenzie if he was involved; McKenzie replied that "he [Strojny] hit me a couple of times so I guess I was involved." McKenzie did not tell the officer that defendant kicked Strojny. (Tr. 323.) Nicholas told police McKenzie was "babbling" and said something like "we were just playing." Id. at 293. According to Nicholas, McKenzie also asserted that although defendant thought Strojny was going to hurt McKenzie badly, "he didn't mean it to go this far." Id. Bryan told police McKenzie said defendant was stomping and kicking Strojny's head.
 {¶ 16} In the meantime, defendant returned from his trip to the restaurant. He had the neighbor drop him off in the street behind his house because he realized the police were at Strojny's house. Bryan and two other men saw defendant and called his name. Defendant slipped between two houses in an apparent attempt to hide from the men. Bryan identified defendant to a patrol officer as being involved in the fight. The officer detained defendant without incident. *Page 9 
 {¶ 17} Strojny died from his injuries on June 8, 2005. Dr. Steven Sohn, a board-certified forensic pathologist, performed an autopsy on behalf of the Franklin County Coroner's office and prepared a report of his findings. Dr. Sohn identified autopsy photographs that depicted a large contusion covering the entire right side of Strojny's skull, indicating Strojny suffered multiple blunt force impacts to the head. Dr. Sohn opined that such trauma caused Strojny's brain to swell, resulting in herniation of the brain through the base of the skull that exerted pressure on the part of the brain controlling heart and lung function. Dr. Sohn also testified Strojny suffered swelling and hemorrhaging of the neck musculature and a fracture of the hyoid bone, the wishbone-shaped bone contained in the musculature at the base of the tongue. Dr. Sohn opined that these injuries are consistent with manual strangulation, but he admitted such injury could result from an impact to the throat. According to Dr. Sohn, the fractured hyoid bone resulted in massive bleeding inside Strojny's neck and alone could have caused death.
 {¶ 18} Based on his findings, Dr. Sohn concluded that the "immediate cause" of Strojny's death was a "craniocerebral blunt force injury," meaning a "closed-head injury." (Tr. 524, State's Exhibit I.) The "mechanism" of the injury was Strojny's "head falling in a rapid speed and impacting [a] hard object." (Tr. 525.) Dr. Sohn explained that kicking or stomping a person's head while up against a concrete block would "accelerate the process of brain swelling and death." Id. at 559. Dr. Sohn clarified that strangulation was a "contributing cause" of Strojny's death. Id. at 526-527.
 {¶ 19} Defendant's expert, Dr. Christopher Demas, a board-certified family medicine specialist, reviewed several of the autopsy photographs, as well as Dr. Sohn's *Page 10 
report, but Dr. Demas did not perform or observe the autopsy and did not confer with Dr. Sohn. Dr. Demas opined that Strojny's death was caused by a "one-two punch" of significant neck trauma that created increased cranial pressure and cut off blood to the brain, followed by "craniocerebral blunt force injuries." He further opined that strangulation via a headlock was sufficiently severe to fracture the hyoid bone and cause the severe damage to the neck musculature that contributed to Strojny's death. He, however, further testified that a blow to the head was the "final cause" of death. (Tr. 1209.)
II. First Assignment of Error {¶ 20} Defendant's first assignment of error contends the trial court erred in denying his motion to sever his trial from McKenzie's trial.
 {¶ 21} Pursuant to Crim.R. 8(B), two defendants may be jointly indicted and tried for a non-capital offense as long as "they are alleged to have participated in the same act or transaction * * * or in the same course of criminal conduct." State v. Cotton (Dec. 6, 1996), Montgomery App. No. 15115. As a general rule, the law favors joinder of defendants and the avoidance of multiple trials because it " `conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries.' " State v. Daniels (1993), 92 Ohio App.3d 473, quoting State v. Thomas (1980), 61 Ohio St.2d 223, 225. Nonetheless, a defendant may move for severance pursuant to Crim.R. 14. "If it appears that a defendant or the state is prejudiced by a joinder of * * * defendants * * * for trial * * * the court shall order an *Page 11 
election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." Crim.R. 14.
 {¶ 22} To demonstrate a trial court's error in denying severance, a defendant must establish: "(1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." State v.Schaim (1992), 65 Ohio St.3d 51, 59, citing State v. Torres (1981),66 Ohio St.2d 340, syllabus. A trial court abuses its discretion when it acts unreasonably, arbitrarily, or unconscionably. State v. Adams
(1980), 62 Ohio St.2d 151, 157.
 {¶ 23} Defendant contends severance was warranted because he and McKenzie presented mutually antagonistic defenses, each arguing the other caused Strojny's death. Defenses are mutually antagonistic where each defendant attempts to exculpate himself and inculpate his co-defendant. Daniels, supra, at 486. To merit severance, the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. United States v. Berkowitz (C.A.5, 1981), 662 F.2d 1127,1133. The essence or core of the defenses must be in conflict, such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other. Id. at 1134. "In such a situation, the co-defendants do indeed become the government's best witnesses against each other. Where two defendants present defenses that are antagonistic at their core, a substantial possibility exists `that the jury will unjustifiably infer that this conflict alone *Page 12 
demonstrates that both are guilty.' " Id., quoting United States v.Eastwood (C.A.5, 1973), 489 F.2d 818, 822, n. 5, quoting United States v.Robinson (D.C. Cir. 1970), 432 F.2d 1348, 1351.
 {¶ 24} "Antagonistic defenses can prejudice co-defendants to such a degree that they are denied a fair trial." Daniels, supra. Nonetheless, in Zafiro v. United States (1993), 506 U.S. 534, the court rejected a bright-line rule mandating severance whenever co-defendants asserted conflicting defenses, holding that "[m]utually antagonistic defenses are not prejudicial per se." Id. at 538. Elaborating, the court stated "[w]e believe that, when defendants properly should have been joined under [Federal Criminal] Rule 8(b), a [trial] court should grant a severance under [Federal Criminal] Rule 14 only if there is a serious risk that a joint trial could compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539.
 {¶ 25} The Zafiro court described the type of prejudice that might warrant severance, stating, "[s]uch a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty." Id. The court further noted "[e]vidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory *Page 13 
evidence that would be available to a defendant tried alone were unavailable in a joint trial." Id.
 {¶ 26} Citing Bruton v. United States (1968), 391 U.S. 123, defendant asserted separate trials were required because defendant's Sixth Amendment right of confrontation would be violated if the state introduced a statement McKenzie made to law enforcement personnel implicating defendant. In addition, defendant summarily asserted separate trials were necessary because he and McKenzie intended to present mutually antagonistic defenses at trial.
 {¶ 27} In denying the motion, the trial court noted a Bruton problem arises only when the trial court admits into evidence a non-testifying defendant's statement that implicates the other defendant in criminal activity. If, the court concluded, the statement is not offered or admitted in the state's case-in-chief, or if the co-defendant testifies, severance is not required. The court determined that should the state attempt to admit such a statement in its case-in-chief, the court would declare the statement inadmissible and thus preserve defendant's confrontation rights. On that basis, the trial court overruled defendant's motion. The court did not specifically address the issue of mutually antagonistic defenses.
 {¶ 28} Although it is not part of the record on appeal in this case, McKenzie apparently also filed a motion to sever in mid-April 2006. According to the motion hearing transcript, made part of the record here, defendant "[stood] on" his prior motion and offered no further argument. (Tr. 10.) McKenzie asserted that pursuant to an impending forensic report from defendant's expert medical witness, defendant and McKenzie were *Page 14 
prepared to present mutually antagonistic defenses concerning the cause of Stojny's death. McKenzie maintained defendant and McKenzie should be tried separately due to the potentially prejudicial effect of the conflicting defense theories on their right to a fair trial. The trial court found the motion premature, as the forensic report had yet to be filed. The court apparently later overruled the motion.
 {¶ 29} Prior to jury voir dire, defendant orally moved for severance pursuant to Bruton, this time on the ground McKenzie recently proffered a statement to the prosecution inculpating defendant. The state asserted the statement was proffered in an attempt to resolve the case against McKenzie and, since that effort had failed, the statement was inadmissible. McKenzie orally renewed his request for severance due to the impending presentation of mutually antagonistic defenses. The trial court overruled both motions, and the case proceeded to trial. Defendant renewed the motion for severance both at the close of the state's case and at the close of his own case.
 {¶ 30} Initially, we note judicial economy weighs in favor of the trial court's decision to try defendant and McKenzie together. The state called several witnesses and introduced numerous exhibits in its case-in-chief, nearly all of which would appear to be duplicated in separate trials against defendant and McKenzie. Judicial economy, however, does not outweigh a defendant's right to a fair trial.State v. Brown (Oct. 11, 1985), Montgomery App. No. CA 8560. The issue thus resolves to whether the trial court's refusal to sever the trials denied defendant a fair trial.
 {¶ 31} The record belies defendant's claim that he and McKenzie presented mutually antagonistic defenses. Initially, defendant never articulated a clear defense *Page 15 
theory and thus did not provide the court with sufficient information so it could weigh the noted considerations favoring joinder against defendant's right to a fair trial. Schaim, supra. Defendant's pretrial motion, as well as his renewed motion prior to voir dire, lacked specificity about the nature of his defense.
 {¶ 32} Equally damaging to his motion, defendant during trial presented two alternative defense theories. In opening statement, defendant asserted a "one-two punch" causation theory for Strojny's death. According to that defense, the headlock McKenzie imposed on Strojny resulted in a fractured hyoid bone that, in turn, caused intracranial pressure to the brain. The intracranial pressure, followed by Strojny's hitting his head on the concrete steps while still in the headlock, combined to cause Strojny's death. Defendant, however, asserted a second defense theory: believing McKenzie to be in imminent danger of serious physical harm from Strojny, defendant justifiably caused Strojny's death in coming to McKenzie's aid.
 {¶ 33} Although ostensibly pursuing his dual defenses during trial, defendant in reality relied on his "defense of another" argument. For example, in discussions pertaining to discovery, defendant repeatedly asserted the state should have provided certain evidence because it bolstered his "defense of another" theory. In opening statement, defendant asserted an individual has the right to defend another if the individual believes the other person's life is in danger. Further, in discussions regarding jury instructions, defendant objected to the trial court's preliminary decision not to provide a defense of another instruction and argued "that's really the theory of our case." (Tr. 1814.) Defendant later renewed his objection, asserting his own testimony established Strojny was fatally *Page 16 
injured when defendant came to McKenzie's aid upon McKenzie's request for help. In so arguing, defendant asserted, "[t]hat's our whole case. Really from the beginning we've presented that this was a defense of others case" (Tr. 1839) and "that's been the crux of our entire case." Id. at 1845. At defendant's urging, the trial court agreed to give the instruction.
 {¶ 34} In closing argument, all three parties acknowledged the dual nature of defendant's defense. While the state maintained defendant's and McKenzie's actions combined to cause Strojny's death, it also acknowledged defendant's defense of another theory, arguing the evidence failed to support it. In closing argument, McKenzie noted defendant presented two separate defense theories. Defendant's closing argument first argued "the biggest issue in this case is cause. What caused the death?" (Tr. 1912.) Defendant posited Strojny's death was caused by the "one-two punch" of Strojny hitting his head on the concrete step while in McKenzie's headlock. Defendant, however, also argued that if the jury concluded defendant caused Strojny's death, it should find he was justified in doing so in defending McKenzie.
 {¶ 35} Presumably because the "core" defense of the co-defendants must be mutually antagonistic in order to warrant severance, defendant notes no case in which a defendant, as here, pursued alternative defense theories, yet argued for severance on grounds that one of those theories was mutually antagonistic to a co-defendant's single defense theory. We decline to extend the case law pertaining to severance to include the presentation of multiple "core" defenses, especially when the record is unclear which defense is defendant's "core" defense. *Page 17 
 {¶ 36} To the extent defendant's "defense of another" theory is his "core" defense, such defense is not mutually antagonistic to McKenzie's "no causation" theory. "Defense of another is a variation of self-defense." State v. D.H., 169 Ohio App.3d 798, 2006-Ohio-6953, at ¶ 32. Self-defense is an affirmative defense. State v. Brown, Mahoning App. No. 03 MA 231, 2005-Ohio-4502, at ¶ 14. "This defense does not merely deny or contradict the evidence offered by the State, but rather admits the prohibited conduct while claiming that surrounding facts or circumstances justify the conduct." Id., citing State v. Grubb (1996),111 Ohio App.3d 277, 282. Defendant's "defense of another theory" admits he caused Strojny's death, but contends defendant's actions were justified under the circumstances. As McKenzie also argues defendant caused Strojny's death, the defenses are not mutually antagonistic.
 {¶ 37} Moreover, even if the defenses defendant and McKenzie raised concerning causation arguably were mutually antagonistic, defendant fails to establish prejudice. Mutually antagonistic defenses are not per se prejudicial. Zafiro, supra. Further, even where the risk of prejudice is high, severance need not be ordered where " `less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.' " Id. at 539, quoting Richardson v. Marsh (1987),481 U.S. 200, 211.
 {¶ 38} For example, defendant at trial argued a joint trial was highly prejudicial because it was likely the jury would convict both co-defendants. Defendants, however, "are not entitled to severance merely because they have a better chance of acquittal in separate trials." Zafiro, supra, at 540. Further, the jury verdicts support the inference that the jury meticulously sifted the evidence and did not "unjustifiably infer that the conflict *Page 18 
alone demonstrate[d] that both [were] guilty." Berkowitz, supra;State v. Allen (Apr. 11, 1995), Richland App. No. 94 CA 51.
 {¶ 39} Similarly, defendant's assertion he was forced to defend against McKenzie's counsel as a "second prosecutor" is insufficient to require severance. While defendant takes issue with McKenzie's efforts to shift the blame for Strojny's death to him, "the relevant inquiry after Zafiro focuses on specific and significant prejudice, not on a more general `second prosecutor' theory." United States v. Balter
(C.A.3, 1997), 91 F.3d 427, 434, citing United States v.Beuna-Lopez (C.A.9, 1993), 987 F.2d 656. Further, "[m]ere finger pointing between co-defendants, i.e., the familiar `he did, not I' defense, normally is not a sufficient ground for severance based upon mutually antagonistic defenses." State v. Bunch, Mahoning App. No. 02 CA 196, 2005-Ohio-3309, at ¶ 43, citing United States v. Pena-Lora (C.A.1, 2000), 225 F.3d 17, 33. " `The mere fact that one defendant tries to shift blame to another defendant does not mandate separate trials, * * * as a codefendant frequently attempts to "point the finger," to shift the blame, or to save himself at the expense of the other[.]' " UnitedStates v. Flores (C.A.8, 2004), 362 F.3d 1030, 1039-1040. (Citations omitted.) " `A defendant does not have a right against having his co-defendant elicit testimony which may be damaging to him.' " Id. at 1041, quoting United States v. Andrus (C.A.7, 1985), 775 F.2d 825, 849.
 {¶ 40} Similarly unpersuasive is defendant's claim the joint trial prejudiced him when the trial court prohibited specific reference to a prior rape allegation on grounds it would prejudice McKenzie. During opening statement, defendant alluded to a "disagreement" between defendant, Strojny, McKenzie, Nicholas and Ashley several *Page 19 
months before the June 7, 2005 incident. (Tr. 178.) The state objected and at a sidebar explained that Nicholas and Strojny were not involved in the prior disagreement; rather, the disagreement arose out of Ashley's allegation that defendant and McKenzie raped her. The state argued the issue was not relevant because the alleged rape was never prosecuted. McKenzie also objected, arguing the rape accusation was improper character evidence.
 {¶ 41} In the ensuing discussion, defendant indicated he would avoid using the word "rape," but argued he should be able to mention the prior disagreement between Strojny and McKenzie in order to establish it may have precipitated the fight on June 7, 2005. McKenzie not only objected on grounds that any discussion of the rape allegation would prejudice McKenzie but argued the topic highlighted the problem of joinder. The state expressed its fear such testimony would "open a door" that would require the state to present more specific evidence about the rape allegation. Defendant responded that the state should be prevented from doing so, because "all the rape stuff was a "collateral issue." (Tr. 181.)
 {¶ 42} Ultimately, the state suggested the matter be limited to a statement that an "incident" occurred in the neighborhood involving Ashley, defendant, and McKenzie, and Strojny and McKenzie were discussing it immediately prior to the fight. (Tr. 187.) Defendant agreed he would "do that if that's the way you want me to say it" and that he had "no problem" with that solution. Id.
 {¶ 43} Because the rape allegation was lodged against both defendant and McKenzie, the "prior incident" limitation benefited defendant as well as McKenzie, *Page 20 
ensuring no "door" would be opened that would allow the state to present specific evidence of the rape allegation against defendant. Even if defendant were entitled to present specific evidence of the rape allegation against McKenzie in a severed trial, the trial court was within its discretion in concluding that the "prior incident" limitation sufficiently cured any prejudice without the need for severance, especially in view of defendant's agreement to the limitation.Zafiro, supra, at 539. Further, despite the "prior incident" limitation, defendant was able to assert that an argument between McKenzie and Strojny precipitated the fight that led to Strojny's death. Indeed, defendant testified the incident caused "strife" between McKenzie and Strojny, and the two argued about it before the "scuffle." (Tr. 1372, 1395-1398.)
 {¶ 44} Finally, defendant failed to demonstrate the jury was prevented from making a reliable judgment about his guilt or innocence. The trial court properly instructed the jury it was to consider separately the question of guilt, or lack of guilt, of each defendant. A jury is presumed to follow a trial court's instructions. State v. Fears (1999),86 Ohio St.3d 329, 334. To further aid the jury, the court provided the jury with separate verdict forms for each defendant and each charge.State v. Herring (Feb. 11, 1999), Mahoning App. No. 96 CA 88. Nothing in the record suggests the joint trial confused the jury or caused the jury any difficulty in separating the evidence as it related to defendant and McKenzie.
 {¶ 45} Because defendant failed to demonstrate the trial court abused its discretion in refusing to sever his trial from the trial of McKenzie, the first assignment of error is overruled. *Page 21 
III. Second Assignment of Error {¶ 46} Defendant's second assignment of error asserts the state's failure to timely provide material information violated Brady v.Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194, Crim.R. 16, or both. Defendant contends the material contained exculpatory information that directly supported his defense, inconsistencies that undermined the credibility of prosecution witnesses, and damaging information of which he was previously unaware. According to defendant, the trial court's failure to grant a 40 to 60 day continuance to investigate the leads forced him prematurely to trial and thus denied him a fair trial.
 {¶ 47} Prior to jury voir dire, defendant noted that on the previous evening, the state provided him access to 22 police informational summaries, including inculpatory and exculpatory statements that defendant, McKenzie, or other witnesses made. The summaries at issue were prepared following police interviews conducted shortly after the incident. Defendant asserted that numerous statements included in the informational summaries should have been provided as part of the state's pretrial discovery.
A. Brady claim. {¶ 48} In Brady, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. The court subsequently expanded upon the concept of "material" evidence in United States v. Bagley (1985),473 U.S. 667, 676, holding evidence is "material" only if a "reasonable probability" exists that the result of the *Page 22 
proceeding would have been different had the evidence been disclosed to the defense. Id. at 682. See, also, Kyles v. Whitley (1995),514 U.S. 419, 434. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id., quoting Strickland v.Washington (1984), 466 U.S. 668, 694.
 {¶ 49} Here, defendant's due process rights were not violated becauseBrady is not applicable. The Brady rule applies only where suppressed exculpatory information is discovered after trial. United States v.Agurs (1976), 427 U.S. 97, 103. The state provided defendant the opportunity to examine the informational summaries prior to trial. In addition, the state provided defendant, prior to the commencement of witness testimony, the audiotapes from which the informational summaries were prepared, and defendant had those audiotapes transcribed. "Where exculpatory evidence is revealed prior to trial, the state has timely disclosed the evidence and there is no violation that would require a reversal or mistrial." State v. Fornash, Butler App. No. CA2003-04-082,2004-Ohio-797, at ¶ 20. Indeed, even when exculpatory information is disclosed during trial, there is no due process violation underBrady as long as " `the material is disclosed to a defendant in time for its effective use at trial.' " State v. Iacona (2001), 93 Ohio St.3d 83,100, quoting United States v. Smith Grading Paving, Inc. (C.A.4, 1985), 760 F.2d 527, 532; State v. Hanna (2002), 95 Ohio St.3d 285. The material here was disclosed to defendant in time for its effective use at trial, as defendant was able to effectively cross-examine the pertinent witnesses concerning the statements contained in the informational summaries. *Page 23 
B. Crim.R. 16 claim. {¶ 50} Defendant also argues the state violated Crim.R. 16 by failing to timely provide the informational summaries. Crim.R. 16 imposes certain obligations on the state with regard to discovery, and the state must comply with the letter and spirit of the rule or affirmatively demonstrate its inability to do so. State v. Grays (Oct. 29, 2001), Madison App. No. CA2001-02-007. The purpose of Crim.R. 16 is to produce a fair trial by preventing surprise and "the secreting of evidence favorable to one party." Lakewood v. Papdelis (1987), 32 Ohio St.3d 1,3.
 {¶ 51} Defendant contends the state was required under Crim.R. 16(B)(1)(a)(i) to provide the informational summaries in which witnesses related statements defendant or McKenzie made. Crim.R. 16(B)(1)(a)(i) requires the state to disclose "[r]elevant written or recorded statements made by the defendant or co-defendant, or copies thereof."
 {¶ 52} In addressing Crim.R. 16(B)(1)(a), this court defined the word "statement" as: "(1) a written statement actually signed, or otherwise adopted or approved, by a witness or party, (2) a mechanical recording of the witness' words or transcription thereof, or (3) a substantially verbatim recital of such statement in a continuous narrative form."State v. Jones (Mar. 16, 1999), Franklin App. No. 98AP-544, citingState v. Cummings (1985), 23 Ohio App.3d 40. The word "statement" does not include an investigator's "own selections, interpretations, or interpolations." State v. Moore (1991), 74 Ohio App.3d 334, 340-341.
 {¶ 53} The trial court reviewed the informational summaries at issue and preserved them in the record. None of the materials constitute "statements" of either *Page 24 
defendant or McKenzie and are thus not discoverable under Crim.R. 16(B)(1)(a)(i). Similarly, we disagree with defendant's contention that the challenged statements were favorable and material and thus discoverable under Crim.R. 16(B)(1)(f). Defendant's failure to demonstrate the statements were favorable and material underBrady precludes any relief under Crim.R. 16(B)(1)(f). State v.Keene (1998), 81 Ohio St.3d 646, 650 (stating that the words "favorable" and "material" in Crim.R. 16[B][1][f] have the same meaning as inBrady).
 {¶ 54} Furthermore, even if defendant established a Crim.R. 16 violation, he still would not be entitled to relief. Prosecutorial violations of Crim.R. 16 require reversal only when the defendant demonstrates (1) the state's failure to disclose was willful, (2) disclosure of the information prior to trial would have aided the defense, and (3) the defendant suffered prejudice. State v.Jackson, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 131, citing State v.Parson (1983), 6 Ohio St.3d 442, 445.
 {¶ 55} No evidence suggests the state willfully violated Crim.R. 16. Indeed, the state permitted defendant to review its entire file, including the informational summaries and the audiotapes from which the informational summaries were prepared. In addition, defendant fails to explain with any specificity how earlier disclosure of the informational summaries would have aided his defense. Jones, supra, citing State v.Wiles (1991), 59 Ohio St.3d 71, 79. Finally, defendant failed to demonstrate how he was prejudiced. As noted, defendant effectively cross-examined the pertinent witnesses, including McKenzie, concerning the content of the informational summaries. Accordingly, the trial court was *Page 25 
within its discretion in refusing defendant's request for a continuance. The second assignment of error is overruled.
IV. Third Assignment of Error {¶ 56} Defendant's third assignment of error asserts the trial court was without authority to find him guilty on the charge of felony murder because R.C. 2903.02(B) expressly provides the statute does not apply when the defendant may be charged with involuntary manslaughter.
 {¶ 57} Preliminarily, we note defendant failed to object in the trial court; as such, he waived any error. Absent objection, defendant must demonstrate plain error to warrant reversal. State v. Locklear, Franklin App. No. 06AP-259, 2006-Ohio-5949, at ¶ 25. See, also, Crim.R. 52(B). "Even if a forfeited error satisfies the requirements of Crim.R. 52(B), Crim.R. 52(B) does not demand that an appellate court correct it. Crim.R. 52(B) states only that a reviewing court `may' notice plain forfeited errors; a court is not obliged to correct them. [The Supreme Court] acknowledged the discretionary aspect of Crim.R. 52(B) by admonishing courts to notice plain error `with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " Id., quoting State v. Barnes (2002), 94 Ohio St.3d 21, 27, quoting State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 58} R.C. 2903.02(B) provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or2903.04 of the Revised Code. Relying on the common law "independent *Page 26 
felonious purpose" doctrine, defendant contends R.C. 2903.02(B) does not apply when the predicate crime is the assaultive conduct that resulted in the victim's death.
 {¶ 59} In Ohio, statutes, not common law, define crimes. Akron v.Rowland (1993), 67 Ohio St.3d 374, 383, fn. 4, citing R.C. 2901.03(A). Contrary to defendant's contention, R.C. 2903.02(B) contains no "assaultive conduct" limitation on what crimes may serve as the predicate felony; nor does the statute require the predicate felony have an "independent felonious purpose."
 {¶ 60} State v. Hayden (July 14, 2000), Lake App. No. 99-L-037 addressed an argument similar to the one defendant posits here. In that case Hayden argued the General Assembly, in passing R.C. 2903.02(B), created a new felony-murder statute that ignored the limitations of the independent felony rule. Hayden contended the statute was unconstitutional because it allowed "crimes such as felonious assault, which are not independent of the conduct which kills, to be the basis upon which the murder is charged." Id. Hayden further asserted R.C.2903.02(B) was unreasonable because it failed "to reflect the independent felony limitations of the felony-murder doctrine, thus allowing for the application of the murder charge onto conduct that historically would have fallen under Ohio's involuntary manslaughter statute." Id.
 {¶ 61} The court concluded Hayden did not demonstrate R.C. 2903.02(B) to be unconstitutional. Explaining, the court stated that, although the intent to kill is conclusively presumed as long as the state proves the required intent to commit the underlying felony, the state nonetheless must prove intent regarding the underlying offense. In support, the court noted initially that, under the common law, " `malice aforethought' was ascribed to a *Page 27 
felon who killed another in the perpetration of an inherently dangerous felony such as rape, robbery, or burglary." Hayden, supra. The court further noted that "the United States Supreme Court recognized that `prosecutors do not need to prove a culpable mental state with respect to the murder because intent to kill is conclusively presumed if the state proves intent to commit the underlying felony.' " (Citations omitted.) Id. The court also observed that "several states have found that felony-murder statutes pass constitutional muster regarding themens rea issue because those statutes require the state prove the intent of the underlying felony." Id.
 {¶ 62} In facts strikingly similar to those in defendant's appeal,Hayden concluded "the nexus between the underlying felony and the homicide was apparent," as the state "presented sufficient evidence to establish that [the defendant] knowingly and repeatedly stomped on the victim's head, which eventually led to the victim's death." Id. The state thus "satisfied the mens rea for murder by proving the intent of the underlying felony, felonious assault." Id. For the same reasons, the nexus and mens rea of the underlying felony were demonstrated here. Moreover, under the plain language of R.C. 2903.02(B), second-degree felonious assault may serve as the predicate offense of violence for felony murder. State v. Miller, 96 Ohio St.3d 384, 2002-Ohio-4931, syllabus (stating "[f]elony murder as defined in R.C. 2903.02[B], with the underlying offense of violence being felonious assault, is supported by evidence that establishes that the defendant knowingly caused physical harm to the victim"). As the Miller court stated, "the General Assembly has chosen to define felony murder in this manner, and the General Assembly is presumed to know the consequences of its legislation." Id. at ¶ 34. *Page 28 
 {¶ 63} Defendant further contends R.C. 2903.02(B) does not apply when the offender is also subject to prosecution for voluntary manslaughter pursuant to R.C. 2903.03 or involuntary manslaughter under R.C. 2903.04. Defendant notes the trial court, at his request, provided a jury instruction on the lesser-included offense of involuntary manslaughter predicated on a misdemeanor assault.
 {¶ 64} The Second District Court of Appeals considered a similar issue in State v. Brodie, 165 Ohio App.3d 668, 2006-Ohio-982. Appealing the trial court's interpretation of R.C. 2903.02(B), the state contended the language in R.C. 2903.02(B) referring to R.C. 2903.04 required the state to prove only that the first-or second-degree felony offense of violence alleged as the underlying offense to murder does not constitute involuntary manslaughter. Id. at ¶ 8. The appellate court agreed, stating the required first-or second-degree felony "offense of violence * * * cannot be satisfied merely by an offense of voluntary manslaughter, which will always be an offense of violence constituting a first-degree felony, or by an offense of Involuntary Manslaughter, which will be an offense-of-violence constituting a first-degree felony if it violates division (A) of R.C. 2903.04." Id. at ¶ 26. Rather, "the first-or second-degree felony offense of violence requirement requires, for its satisfaction, some first-or second-degree felony offense of violence other than voluntary manslaughter or involuntary manslaughter."
 {¶ 65} Although Brodie does not address the precise issue defendant raises, it is sufficiently similar to resolve the issue before us. R.C.2903.02(B) prohibits voluntary and involuntary manslaughter from serving as the predicate felony, but the statute does not prohibit prosecuting an offender for felony murder merely because the offender could *Page 29 
have also been charged with voluntary or involuntary manslaughter. The third assignment of error is overruled.
V. Fourth Assignment of Error {¶ 66} Defendant's fourth assignment of error asserts the trial court improperly excluded evidence of the rape allegation against McKenzie. Defendant contends it was relevant and material because it established the predicate for the argument between McKenzie and Strojny that led to Strojny's death.
 {¶ 67} A trial court has broad discretion in the admission or exclusion of evidence. State v. Harrison, Franklin App. No. 06AP-827,2007-Ohio-2872, at ¶ 15, citing State v. Robb (2000), 88 Ohio St.3d 59,68. "Absent an abuse of discretion, an appellate court will not disturb a ruling by a trial court as to the admissibility of evidence." Id., citing State v. Martin (1985), 19 Ohio St.3d 122, 129.
 {¶ 68} In our discussion of the first assignment of error, we recited much of the parties' initial colloquy regarding the rape allegation. The discussion demonstrates defendant agreed to the "prior incident" limitation and indeed benefited from it. The issue was raised again immediately preceding defendant's direct testimony when defendant's counsel informed the trial court he instructed defendant, per the court's previous order, not to mention the rape allegation. The trial court permitted defendant's counsel to proffer what defendant would testify: immediately preceding the fight, Strojny, in a fit of rage, called McKenzie a rapist and said he was lucky the police did not arrest him. In response, the state reiterated that if defendant "opened the door" to the rape accusation, the state would elicit testimony from the neighbors that Strojny did not like Ashley and was aligned *Page 30 
with defendants regarding the rape accusations. The trial court reiterated its decision to limit mention of the rape allegation to the "prior incident."
 {¶ 69} The "prior incident" limitation permitted defendant to explain why McKenzie and Strojny were fighting, while ensuring that no "door" would be opened to allow the state to present more specific evidence about the rape allegation deleterious to defendant. Moreover, contrary to defendant's contention, the purpose of the "prior incident" limitation was not to avoid severing the trial, but to shield both McKenzie and defendant by preventing the jury from hearing specific evidence of the rape allegation. The trial court did not abuse its discretion in excluding the challenged evidence. The fourth assignment of error is overruled.
VI. Fifth Assignment of Error {¶ 70} Defendant's fifth assignment of error claims he was denied a fair trial because the trial court improperly castigated defendant's counsel in the presence of the jury. During his examination of Dr. Demas, defendant inquired whether the Franklin County Coroner is a forensic pathologist; Dr. Demas answered in the negative. The trial court, sua sponte, immediately convened a bench conference and requested that defendant's counsel clarify to the jury that the elected Franklin County Coroner, although authorized to sign a death certificate, does not typically testify to cause of death. Defendant's counsel stated he was "worried" that neither the state nor McKenzie objected to his question, and asked the trial court "if you see those sorts of things with the prosecution doing it that you would have such an objection for them, too." (Tr. 1251.) *Page 31 
 {¶ 71} The trial court informed defendant's counsel he had "crossed the line," and that if he made a similar statement he was "going to be in trouble." Id. Upon the protest of defendant's counsel that he was only making a record, the trial court stated, "[B]e quiet. You have impugned the integrity of this Court twice today." Id. After defendant's counsel interrupted the trial court mid-sentence, the court asked him if he "want[ed] to be a guest of the county." Id. Defendant's counsel reported "[t]he jury can hear you." Id. The trial court responded, "Okay"; it then admonished defendant's counsel for suggesting the court was "aligned with any side in this case." The court informed defense counsel it was seriously considering referring the matter to the Disciplinary Counsel. The court apologized for "being upset" and ordered a brief recess. The court further stated, "I am not going to put up with this again. Is that understood?" Id. at 1251-1252. The court declined defense counsel's request to respond. Id. at 1252.
 {¶ 72} In chambers, defendant's counsel advised he did not believe he crossed any boundaries while zealously representing his client; he also indicated he could not understand why the court intervened, without objection, when the line of examination was ostensibly legitimate. Counsel explained the purpose of his comment was to remind the trial court that "what's good for the goose is good for the gander"; he suggested the court "not interpose objections and just remain neutral and detached that way." Id. at 1258. Following the discussion, trial resumed.
 {¶ 73} A trial judge is " `presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity.' " State v. Corrai, Franklin App. No. 04AP-599, 2005-Ohio-1156, at ¶ 18, quoting *Page 32 Okocha v. Fehrenbacher (1995), 101 Ohio App.3d 309, 322. "In determining whether the trial court's comments were prejudicial: (1) the burden of proof is placed upon the defendant to demonstrate prejudice; (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for; (3) the remarks are to be considered in light of the circumstances under which they are made; (4) consideration is to be given to the possible effect upon the jury; and (5) their possible impairment of the effectiveness of counsel." Id., citing State v. Wade (1978), 53 Ohio St.2d 182, 188.
 {¶ 74} Defendant fails to demonstrate the trial court's comments had any effect on the jury. The transcript of the sidebar provides that "the Court and counsel conferred out of the hearing of the jury." (Tr. 1249.) Moreover, following the assertion of defendant's attorney that "the jury was looking at me while I was being told I might get reported to disciplinary counsel," the trial court assured counsel that the bailiff, who was standing between the judge and the jury, did not hear the discussion. Id. at 1258. Although defendant's counsel initially believed the jury heard the exchange, he later admitted he did not know whether the jury heard it. Id. After the court reiterated that the jury did not hear the discussion, counsel stated, "[w]ell, that's good." Id.
 {¶ 75} Even if the trial court's comments could be construed as lacking in civility, the trial court's ordering a recess immediately after the exchange demonstrates the court was cognizant of its anger and was willing to take appropriate measures to ensure defendant received a fair trial. Further, defendant has not demonstrated the trial court was *Page 33 
biased against defendant or his counsel based upon the admonition. Nor did the trial court comment upon the evidence or express its feelings as to the outcome of the trial.
 {¶ 76} In addition, the trial court arguably cured any potential prejudice to defendant when it instructed the jury to disregard anything the trial court "said or did that [the jury] might consider an indication as to the Court's view of the facts." (Tr. 2002.) As noted, the jury is presumed to follow the court's instructions. Fears, supra. The fifth assignment of error is overruled.
VII. Sixth Assignment of Error {¶ 77} Defendant's sixth assignment of error contends the trial court erred in permitting the state to stage an impromptu reenactment of defendant's testimony concerning the events leading to Strojny's death.
 {¶ 78} During his direct examination, defendant testified regarding the respective positions of Strojny and McKenzie during the headlock and the ensuing struggle. With the court's permission, defendant demonstrated his testimony, using objects in the courtroom to represent the car parked in Strojny's driveway and the concrete steps; defendant, his counsel, or both represented Strojny. The state objected, contending the demonstration mischaracterized the layout of the crime scene. The trial court overruled the objection, stating, "[i]f he's wrong, that's what cross is for." (Tr. 1408.)
 {¶ 79} On cross-examination, the state questioned defendant about his version of the events. In so doing, the state attempted to physically reenact defendant's testimony, with the male prosecutor representing Strojny and the female prosecutor representing McKenzie. *Page 34 
 {¶ 80} As the state contends, the initial question is waiver. Immediately prior to the reenactment, the trial court held a sidebar at the state's request. The sidebar was not transcribed, but at its conclusion, the trial court stated, "[permission to proceed as you indicated is okay." (Tr. 1500.) The trial court's statement of permission infers that during the sidebar, the state "indicated" its intent to reenact defendant's testimony. Although defendant later objected to size discrepancies between the male and female prosecutors as compared to Strojny and McKenzie, nothing indicates defendant objected to the reenactment generally. The failure to do so waives all but plain error. Crim.R. 52(B); State v. Johnson, 112 Ohio St.3d 210,2006-Ohio-6404, at ¶ 36 (issue waived for failure to raise a "timely objection").
 {¶ 81} Even if defendant did not waive the issue, the reenactment, as well as any statements the prosecution uttered during the reenactment, did not constitute "evidence," but provided context to the prosecution's questions. "[Statements of counsel are not evidence." Corp. Exch. Bldgs.IV V, Ltd. Partnership v. Franklin Cty. Bd. of Rev. (1998),82 Ohio St.3d 297, 298, citing State v. Green (1998), 81 Ohio St.3d 100, 104. Thus, given that counsel's words in posing a question are not "evidence," it follows that counsel's physical movements in illustrating a question are not "evidence." In other words, had the prosecution verbally described defendant's testimony and then posed questions about that testimony, there would be no question that such verbal description would not constitute "evidence." In our view, the result is no different because the prosecution physically reenacted defendant's testimony. As with verbal testimony, any inaccuracies in the reenactment could have been exposed during redirect. Further, the trial court *Page 35 
adequately instructed the jury in its charge that counsel statements are not evidence. (Tr. 149-150, 158, 1982.) In addition, the court instructed the jury that "evidence" consisted only of witness testimony, exhibits, and stipulations. (Tr. 155.)
 {¶ 82} Moreover, even if the reenactment could be described as "demonstrative evidence," defendant fails to demonstrate error. The admission of demonstrative evidence falls under the general standard of relevancy. State v. Adamson (Dec. 30, 1996), Clermont App. No. CA 96-03-031. Evid.R. 401 provides that evidence is relevant when it has the tendency to make the existence of any material fact more probable than it would be without the evidence. Id. Pursuant to Evid.R. 403, relevant evidence is admissible so long as its probative value is not substantially outweighed by the threat of unfair prejudice, confusion of the issues, or of misleading the jury. Id. Such a determination rests within the sound discretion of the trial court. Id., citing Vogel v.Wells (1991), 57 Ohio St.3d 91, 95.
 {¶ 83} The trial court did not abuse its discretion in permitting the reenactment, as it was based upon the facts as presented to the jury through the testimony of defendant. Dissimilarities in the conditions of an in-court demonstration and the conditions existing at the time of the occurrence in dispute do not require exclusion of the evidence.Campbell v. Daimler Group (1996), 115 Ohio App.3d 783, 791-792. Rather, dissimilarities go to the weight to be afforded the reenactment by the jury, not to admissibility. State v. Jackson (1993), 86 Ohio App.3d 568,571.
 {¶ 84} While defendant objected to the reenactment based upon size discrepancies between the prosecutors and the persons involved in the incident, those *Page 36 
discrepancies were obvious to the jury, and the court so noted in overruling the objection. Indeed, the court stated, "[t]he evidence as to the different sizes of the persons are known or at least have been discussed with the jury and they can take them as the relative sizes of the little exhibition here as well." (Tr. 1502.) See Campbell, supra, at 792 (stating "the transcript reveals that the trial court was satisfied that there was little risk that the jury would mistakenly believe that the models were meant to represent the actual conditions which existed at the time of the collapse").
 {¶ 85} The state used the reenactment to impeach defendant's credibility regarding his version of the events of June 7, 2005. The demonstration related directly to the veracity of defendant's sworn testimony and was a proper subject for cross-examination. Under these circumstances, the trial court did not abuse its discretion in permitting the state's reenactment, especially since the court permitted the defendant to conduct his own demonstration. Further, both reenactments reasonably assisted the jury in determining the issues in the case and nothing suggests the jury was either misled or confused.
 {¶ 86} Finally, to the extent defendant contends on appeal that the prosecution's reenactment violated the Rules of Professional Conduct by testifying at trial, we note defendant's objection was based solely upon physical discrepancies between the prosecutors and those they portrayed. Furthermore, because neither the questions posed nor the physical illustration of those questions constituted evidence, the prosecution did not assume the role of a witness in the case. The sixth assignment of error is overruled. *Page 37 
VIII. Seventh Assignment of Error {¶ 87} Defendant's seventh assignment of error contends the trial court violated his constitutional protection against double jeopardy and his statutory rights under R.C. 2941.25 when it sentenced defendant to consecutive prison terms for felony murder and felonious assault. Defendant contends felonious assault must merge with felony murder because felonious assault is the predicate offense to felony murder. Defendant maintains that because both crimes involved a single victim, a single course of conduct, and a single animus, defendant should have been convicted and sentenced on only one of the offenses.
 {¶ 88} In State v. Hall, Franklin App. No. 05AP-957, 2006-Ohio-2742, this court addressed the interplay between state and federal constitutional protections against double jeopardy and Ohio's multi-count statute, R.C. 2941.25. There, we noted that "[t]he federal and state constitutions' double jeopardy protection guards citizens against cumulative punishments for the `same offense.' " Id. at ¶ 16, citing State v. Moss (1982), 69 Ohio St.2d 515, 518.
 {¶ 89} "Despite such constitutional protection, a state legislature may impose cumulative punishments for crimes that constitute the `same offense' without violating double jeopardy protections." Hall, at ¶ 16, citing State v. Rance (1999), 85 Ohio St.3d 632, 635, citingAlbernaz v. United States (1981), 450 U.S. 333, 344. "Under the `cumulative punishment' prong, double jeopardy protections do `no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.' " Hall, at ¶ 16, quoting Missouri v.Hunter (1983), 459 U.S. 359, 366. "When a legislature *Page 38 
signals its intent to either prohibit or permit cumulative punishments for conduct that may qualify as two crimes, the legislature's expressed intent is dispositive." Hall, at ¶ 16, citing Rance, at 635. "Therefore, when determining the constitutionality of imposing multiple punishments against a criminal defendant in one criminal proceeding for criminal activity emanating from one transaction, appellate courts are limited to assuring that the trial court did not exceed the sentencing authority the legislature granted to the judiciary." Hall, at ¶ 16, citingMoss, at 518, citing Brown v. Ohio (1977), 432 U.S. 161.
 {¶ 90} "Under an R.C. 2941.25(A) analysis, the statutorily defined elements of offenses that are claimed to be of similar import are compared in the abstract." (Emphasis sic.) Rance, at paragraph one of the syllabus. In determining whether the elements of the crimes are of similar import, "[c]ourts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes correspond to such a degree that the commission of one crime will result in the commission of the other." Id. at 638. "If the elements do not so correspond, the offenses are of dissimilar import and the court's inquiry ends; the multiple convictions are permitted." Hall, at ¶ 17, citing Rance, at 636.
 {¶ 91} In State v. Henry, Franklin App. No. 04AP-1061, 2005-Ohio-3931, at ¶ 59-60, this court approved and followed an Ohio appellate court's rejection of the precise challenge defendant raises and concluded that because felony murder involves "causing death while committing a first or second-degree felony of violence," but "felonious assault requires knowingly causing serious physical harm to another," "[t]he commission of one crime does not result in the commission of the other." Id. Because felony murder and the *Page 39 
predicate offense of felonious assault thus are not allied offenses of similar import, R.C. 2941.25 authorizes punishment for both crimes, and no double jeopardy violation occurs. See, also, Keene, supra, at 668;State v. Lowe, Franklin App. No. 04AP-1189, 2005-Ohio-6614, at ¶ 28 (noting "the Ohio Supreme Court has consistently held that predicate offenses do not merge into felony murder"). The seventh assignment of error is overruled.
IX. Eighth Assignment of Error {¶ 92} Defendant's eighth assignment of error argues that neither sufficient evidence nor the manifest weight of the evidence support the jury's verdicts finding him guilty of felony murder and felonious assault.
 {¶ 93} Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. Sufficiency is a test of adequacy. Id. We construe the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387.
 {¶ 94} When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict to permit reasonable minds to find guilt beyond a reasonable doubt.Conley, supra; Thompkins, at 387 (noting that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's *Page 40 
resolution of the conflicting testimony"). Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The jury thus may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part or none of a witness's testimony." State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v. Antill (1964), 176 Ohio St. 61, 67.
 {¶ 95} As relevant here, R.C. 2903.02(B) defines murder, stating that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." In this case, the predicate second-degree felony underlying the murder charge is felonious assault, which is defined in R.C. 2903.11(A)(1) as "knowingly * * * caus[ing] serious physical harm to another * * * "
 {¶ 96} As defendant notes, the critical issue in the case was causation. If the evidence is construed in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of murder and felonious assault beyond a reasonable doubt. The eyewitness testimony of McKenzie, Bettina and Tonda permitted a reasonable juror to believe defendant knowingly caused serious physical harm to Strojny by repeatedly kicking him in the head and then stomping it against the concrete step. Further, the expert medical testimony of Drs. Sohn and Demas allowed a reasonable juror to believe the multiple impacts to Strojny's head caused the brain swelling that led to his death. Accordingly, sufficient evidence supports both verdicts. *Page 41 
 {¶ 97} Further, sitting as the thirteenth juror, we cannot say that the jury's resolution of the conflicting testimony was erroneous or that the jury clearly lost its way. In essence, defendant claims the jury should have believed his version of the events of June 7, 2005. A conviction, however, is not against the manifest weight of the evidence solely because the trier of fact heard conflicting evidence.Harrison, supra, at ¶ 33, citing State v. Butts, Franklin App. No. 03AP-495, 2004-Ohio-1136. Given the extent of Strojny's head injuries, the jury could legitimately reject defendant's "one-two punch" theory that asserted the final cause of Strojny's death was his head hitting the concrete step while in McKenzie's headlock. Based upon all the evidence, the jury could reasonably conclude defendant caused Strojny's death as a proximate result of felonious assault. Accordingly, the verdicts are not against the manifest weight of the evidence. The eighth assignment of error is overruled.
 {¶ 98} Having overruled all eight of defendant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
 KLATT and DESHLER, JJ., concur. DESHLER, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 1