[Cite as *State v. Hall*, 2009-Ohio-3824.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

   PLAINTIFF-APPELLEE,                  CASE NO. 1-08-66

   v.

EARL HALL,                          O P I N I O N

   DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR 2007 0324

**Judgment Affirmed**

Date of Decision:  August 3, 2009

APPEARANCES:

   *Kenneth J. Rexford* for Appellant

   *Jana E. Emerick* for Appellee

**PRESTON, P.J.**

{¶1} Defendant-appellant, Earl Hall (hereinafter "Hall"), appeals the Allen County Court of Common Pleas' judgment of conviction and imposition of sentence. For the reasons that follow, we affirm.

{¶2} On September 13, 2007, the Allen County Grand Jury indicted Hall on one (1) count of possession of crack cocaine in violation of R.C. 2925.11(A) & (C)(4)(d), a second degree felony. (Doc. No. 1). On October 15, 2007, Hall was arraigned and entered a plea of not guilty to the indictment. (Id.). The trial court scheduled a two-day jury trial to begin on January 8, 2008. (Doc. No. 11).

{¶3} On October 15, 2007, the State filed a demand for discovery and its response to defendant's demand for discovery. (Doc. Nos. 7-8). On October 18, 2007, Hall filed an "omnibus initial pretrial discovery motion," which sought discovery, a bill of particulars, production of Evid.R. 404(B) evidence, and responded to the State's discovery demand. (Doc. No. 9). That same day, Hall also filed a supplemental discovery and *Giglio-Rovario* motion seeking the identity of any police informants and disclosure of any promises, inducements, or agreements made with the same. (Doc. No. 10). The trial court granted Hall's motion to identify informants on December 4, 2007. (Doc. No. 14).

{¶4} On November 7, 2007, Hall filed another request for supplemental discovery, as requested by his defense expert, seeking, among other things, a

complete copy of the BCI & I case file, a copy of the laboratory protocols, evidence of chain-of-custody, a list of the software programs used to conduct the DNA analysis, STR frequency tables, documentation of corrective actions for discrepancies, and accreditation and background information on the BCI & I laboratory personnel handling the evidence in his case. (Doc. No. 12).

{¶5} On December 26, 2007, Hall filed a motion to continue the jury trial alleging that the State had failed to provide adequate discovery and seeking a court order to compel the State to provide the requested discovery per its November 7, 2007 motion. (Doc. No. 42-43). On December 27, 2007, the trial court granted Hall's continuance motion but denied Hall's motion for discovery finding that Crim.R. 16(B)(1)(d) did not extend to material upon which a report is based, and, likewise, that Crim.R. 16(B)(1)(e) required disclosure of potential witnesses' names, not the substance of their testimony. (Doc. No. 46). The trial court then set the matter for a pre-trial scheduling conference to be held January 7, 2008. (Id.). The jury trial was rescheduled for April 1, 2008. (Doc. No. 48).

{¶6} On January 8, 2008, Hall filed a motion for disclosure of the identity of the confidential informant used to obtain a search warrant for the premises where he was arrested. (Doc. No. 49).

{¶7} On February 20, 2008, Hall filed a motion for reconsideration of the trial court's ruling on his prior discovery request. (Doc. No. 52). On March 13, 2008, the State filed a response to Hall's motion. (Doc. No. 53). On March 14,

2008, the trial court overruled Hall's motion, finding that the disclosure of the scientific report satisfies the State's obligation under Crim.R. 16(B)(1)(d). (Doc. No. 54). The trial court further found that the evidence requested by Hall was not material to his defense, because he had only demonstrated a mere possibility, as opposed to a reasonable probability, that if the material was disclosed the result of the proceedings might be different. (Id.). The trial court then ordered, pursuant to Crim.R. 16(B)(1)(c) & (d), the disclosure of:

> **1. Any results or reports of scientific tests or experiments, made in connection with this particular case;**
> **2. Any papers, documents, tangible objects, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are _intended for use by the prosecuting attorney as evidence at the trial_…**
> **3. Documentation regarding the laboratory protocol following in this case, to wit: the chain of custody, accreditation of the BCI & I Lab with regard to DNA testing, and the qualifications of the laboratory personnel involved in the testing of this case**

(Id., emphasis in original).

{¶8} On March 17, 2008, the State filed a supplemental response to defendant's discovery demand. (Doc. No. 56). On that same day, Hall again filed a motion to continue the jury trial, which the trial court granted and rescheduled the trial for June 10, 2008. (Doc. Nos. 55, 60). Thereafter, on March 21, 2008, Hall filed another request for supplemental discovery seeking chain-of-custody information, to which the State responded on March 27, 2008. (Doc. Nos. 57, 62). On March 28, 2008, Hall filed a request for supplemental discovery seeking any

photographic or other evidence preserving images of latent finger prints found on the plastic baggies. (Doc. No. 63).

{¶9} On April 8, 2008, the trial court reviewed Hall's several discovery motions and overruled his request for discovery of items requested by his expert, but it granted his request for discovery of chain-of-custody information and evidence related to the latent fingerprints. (Doc. No. 64). On April 9, 2008, Hall filed a motion to compel discovery and requesting a hearing. (Doc. No. 65).

{¶10} On May 13, 2008, Hall filed a motion to dismiss alleging that the State committed various *Brady* violations and violated his right to a speedy trial. (Doc. No. 66). On May 27, 2008, the State responded to the motion arguing that Hall failed to establish that the police destroyed or discarded potentially exculpatory evidence in bad faith and that speedy trial time had not lapsed since time is calculated from the date of the indictment, not arrest. (Doc. No. 87). A hearing on the motion was held that same day. (See May 27, 2008 Tr.).

{¶11} On May 28, 2008, the State filed its bill of particulars and supplemental discovery. (Doc. Nos. 102-03). On May 30, 2008, a show cause hearing regarding the State's compliance with discovery was held. (See May 30, 2008 Tr.). At the hearing, Hall moved for a continuance, which the trial court granted and rescheduled trial for July 29, 2008. (Doc. Nos. 111, 119). On May 30th and June 3rd of 2008, the State filed additional supplemental discovery. (Doc. Nos. 108, 110).

{¶12} On July 15, 2008, the trial court overruled Hall's motion to dismiss, finding that the latent fingerprint evidence was not materially exculpatory but only potentially useful and that Hall failed to show bad faith. (Doc. No. 120). The trial court also overruled Hall's motion to dismiss based upon speedy trial, finding that Hall's several continuance motions and motion to dismiss tolled time. (Id.). On July 16, 2008, Hall filed a motion for reconsideration, which the trial court overruled on July 17, 2008. (Doc. Nos. 122-23).

{¶13} On July 24, 2008, the trial court granted Hall's request to perpetuate the testimony of Willie Helton at a hearing. The trial court also granted a continuance in order for the defense to prepare for the hearing and rescheduled the trial for August 26, 2008. (Doc. No. 131).

{¶14} On August 11, 2008, the trial court held a pre-trial hearing wherein Hall waived his right to a speedy trial under R.C. 2945.71 and requested a continuance. The trial court rescheduled the trial for September 16, 2008. (Doc. No. 138).

{¶15} On September 16-18, 2008, the matter proceeded to trial wherein the jury found Hall guilty as charged in the indictment. (Doc. No. 201). On October 27, 2008, the trial court sentenced Hall to six (6) years incarceration. (Doc. No. 212).

{¶16} On October 30, 2008, Hall filed this present appeal. (Doc. No. 220). Hall now appeals raising five assignments of error for our review. We have

elected to address Hall's assignments of error out of the order they appear in his brief.

## ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT SHOULD HAVE DISMISSED THE CHARGES AGAINST HALL FOR CONSTITUTIONAL SPEEDY TRIAL VIOLATIONS.**

{¶17} In his second assignment of error, Hall argues that the trial court erred by not dismissing the charges for a speedy trial violation. The State argues that, when tolled time is calculated, Hall was prosecuted within speedy trial time. We agree with the State.

{¶18} Both the U.S. Constitution and the Ohio Constitution guarantee a criminal defendant the right to a speedy trial. Sixth Amendment to the U.S. Constitution; Section 10, Article 1, Ohio Constitution. *State v. Baker* (1997), 78 Ohio St.3d 108, 110, 676 N.E.2d 883. The states, however, are free to prescribe a reasonable period of time to meet these constitutional mandates. Id., citing *Barker v. Wingo* (1972) 407 U.S. 514, 523, 92 S.Ct. 2182, 33 L.E.2d 101. To that end, R.C. 2945.71(C)(2) provides: "[a] person against whom a charge of felony is pending [s]hall be brought to trial within two hundred seventy days after a person's arrest." The speedy trial provisions in R.C. 2945.71 are coextensive with constitutional speedy trial provisions. *State v. King* (1994), 70 Ohio St.3d 158, 161, 637 N.E.2d 903, citing *State v. O'Brien* (1987), 34 Ohio St.3d 7, 516 N.E.2d 218.

Case No. 1-08-66

**{¶19}** A speedy trial claim involves a mixed question of law and fact for purposes of appellate review. *State v. Masters*, 172 Ohio App.3d 666, 2007-Ohio-4229, 876 N.E.2d 1007, ¶11, citing *State v. High* (2001), 143 Ohio App.3d 232, 242, 757 N.E.2d 1176. Accordingly, a reviewing court must give due deference to the trial court's findings of fact if they are supported by competent, credible evidence but will independently review whether the trial court correctly applied the law to the facts of the case. *Masters*, 2007-Ohio-4229, at ¶11.

**{¶20}** Hall was charged with a felony; and therefore, the State was required to bring Hall to trial within 270 days. R.C. 2945.71(C)(2); (Doc. No. 1). On October 11, 2007, Hall was arrested, served with a copy of the indictment, and released on bond.[1] (Doc. Nos. 4, 5). Hall's trial commenced on September 16, 2008, which is 341 days following his arrest, or 71 days past R.C. 2945.71(C)(2)'s time limitation. However, time may be extended by "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion." R.C. 2945.72(H).

**{¶21}** The record reveals several continuance motions filed by Hall that tolled time. The jury trial was initially scheduled for January 8, 2008, well within R.C. 2945.71's time limitation. (Doc. No. 11). On December 26, 2007, however,

---

[1] Since Hall was released on bond, R.C. 2945.71(E)'s "triple-count provision" is inapplicable here.

Hall filed his first continuance motion, which the trial court granted and rescheduled the trial for April 1, 2008. (Doc. Nos. 42-42, 48). This first continuance tolled speedy trial time 84 days. Then, on March 17, 2008, Hall filed a second continuance motion, which the trial court granted and rescheduled the trial for June 10, 2008. (Doc. Nos. 55, 60). This second continuance tolled speedy trial time 71 days. On May 30, 2008, Hall moved for a third continuance, which the trial court granted and rescheduled the trial for July 29, 2008. (Doc. Nos. 111, 119). This third continuance tolled speedy trial time 49 days. On July 24, 2008, the trial court granted a continuance in order for the defense to prepare for a perpetuation hearing and rescheduled the trial for August 26, 2008. (Doc. No. 131). This fourth continuance tolled speedy trial time an additional 28 days. Finally, on August 11, 2008, the trial court held a pre-trial hearing wherein Hall waived his right to a speedy trial in writing and requested a continuance. The trial court rescheduled the trial for September 16, 2008. (Doc. No. 138). This fifth continuance tolled speedy trial time an additional 21 days. The total speedy trial time tolled from these five continuances equals 253 days. Subtracting tolled time from the time within which Hall was tried (341 – 253) equals 88 days of speedy trial time attributable to the State, well under the 270-day time limitation in R.C.

2945.71(C)(2).[2]  Therefore, Hall's statutory and constitutional speedy trial rights were not violated.

**{¶22}** Hall's second assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. III

### THE TRIAL COURT ERRED BY NOT ENFORCING THE CLEAR DIRECTIVES OF CRIMINAL RULE 16.

**{¶23}** In his third assignment of error, Hall argues that the trial court erred in denying his motion for discovery of the DNA testing documents, specifically those documents related to the allele signatures and signal strengths.  Hall argues that these are "papers" or "documents" within the meaning of Crim.R. 16(B)(1)(c).  Hall also argues that these records are "results" within the meaning of Crim.R. 16(B)(1)(d).  Hall asserts that the trial court incorrectly interpreted Crim.R. 16(B)(1)(d)'s language to only require the disclosure of "reports" when the rule provides discovery of "results and reports."  Hall further argues that the trial court erred by requiring that he demonstrate a "reasonable probability," as opposed to a "mere possibility," that if the requested materials were disclosed to the defense the result of the proceedings might be different.

---

[2] Although not necessary given our calculation of tolling time with regard to Hall's continuance motions, we also note that additional speedy trial time was tolled by, among other things, Hall's request for a bill of particulars, his filing of several discovery motions, and his filing of a motion to dismiss. *State v. Brown*, 98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159 (discovery motions or request for bill of particulars); *State v. Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 293, ¶25, citing *State v. Broughton* (1991), 62 Ohio St.3d 253, 261, 581 N.E.2d 541 (motions to dismiss). (Doc. Nos. 9, 10, 12, 42-43, 49, 53, 57, 65, 66).

{¶24} Hall's supplemental discovery request, which is at issue here, requested more than a copy of the BCI & I DNA analysis report; instead, Hall requested: a complete copy of the BCI & I case file, a copy of the laboratory protocols, evidence of chain-of-custody, a list of the software programs used to conduct the DNA analysis, STR frequency tables, documentation of corrective actions for discrepancies, accreditation, and background information on the laboratory personnel. (Doc. No. 12). The trial court denied Hall's supplemental motion for discovery, finding, in relevant part, that Crim.R. 16(B)(1)(d) did not extend to material upon which a scientific report is based. (Doc. No. 46). After this ruling, Hall filed a motion for reconsideration in which he expanded his argument to include the discoverability of these items under Crim.R. 16(B)(1)(c) as well. (Doc. No. 52). The trial court granted the motion in part and ordered the discovery of evidence of chain-of-custody and accreditation and qualifications of the BCI & I personnel. (Doc. No. 54). However, the trial court overruled the motion in part, finding that: the State complies with Crim.R. 16(B)(1)(d) by providing a copy of the BCI & I DNA analysis report; Hall was inappropriately attempting to use Crim.R. 16(B)(1)(c)'s general provisions as a "catch-all" to circumvent Crim.R. 16(B)(1)(d)'s specific provisions; and that the evidence sought by Hall was not material to his defense. (Doc. No. 54). We agree with the trial court's analysis and ultimate conclusion that several of the items Hall requested were not subject to discovery under Crim.R. 16(B)(1)(c) & (d).

- 11 -

{¶25} Before ruling on the merits of Hall's third assignment of error, we must determine the appropriate standard of review. Hall acknowledges that appellate courts generally review a trial court's decision on a Crim.R. 16 motion under an abuse of discretion standard, but he argues that we should review the trial court's decision here de novo. Hall argues that de novo review is appropriate because the trial court sub judice misinterpreted Crim.R. 16's language and erroneously concluded that the DNA documents were not material to his defense. In support of his argument for de novo review Hall cites *State v. Nguyen*, 157 Ohio App.3d 482, 2004-Ohio-2879, 811 N.E.2d 1180. The State provided no applicable standard of review or discussion of this issue in its brief to this Court.

{¶26} As Hall acknowledges, a trial court generally has broad discretion relating to discovery matters; furthermore, whether to permit discovery *beyond* Crim.R. 16 is at the trial court's discretion. *State ex rel. Mason v. Burnside*, 117 Ohio St.3d 1, 2007-Ohio-6754, 881 N.E.2d 224, ¶11, citing *State ex rel. Citizens for Open, Responsive & Accountable Govt. v. Register*, 116 Ohio St.3d 88, 2007-Ohio-5542, 876 N.E.2d 913, ¶18; *State v. Landrum* (1990), 53 Ohio St.3d 107, 119, 559 N.E.2d 710. Accordingly, an appellate court usually reviews the grant or denial of a discovery motion in a criminal case under an abuse of discretion standard. *State v. Hesson* (1996), 110 Ohio App.3d 845, 851, 675 N.E.2d 532; *State v. Wilson* (1972), 30 Ohio St.2d 199, 201, 283 N.E.2d 632. An abuse of discretion constitutes more than an error of law or judgment; rather, it implies that

the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶27} In *Nguyen*, the Court of Appeals for the Sixth District reviewed de novo a trial court's determination that Crim.R. 16(B)(1)(c) required disclosure of real world reports for a law enforcement drug canine. 2004-Ohio-2879, at ¶¶1, 21. The Court in *Nguyen* acknowledged that such decisions are generally reviewed under an abuse of discretion standard; however, the Court determined that de novo review was appropriate because the trial court's decision was "based upon a misconstruction of the law or an erroneous standard." Id. at ¶¶18, 21. The trial court in *Nguyen* applied an incorrect standard of materiality under Crim.R. 16 when it ruled that real world drug canine reports were discoverable. Id. at ¶¶19-20. The Court of Appeals, thus, identified the correct standard of materiality—taken from the Ohio Supreme Court's decision in *State v. Johnston*—and determined de novo whether the real world reports of the drug canine were discoverable under that standard. Id., citing *Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus.

{¶28} Unlike the trial court in *Nguyen*, the trial court sub judice applied the correct standard of materiality under Crim.R. 16(B)(1)(c) when it determined that documents related to the allele signatures and signal strengths (requested by Hall) were not material to his defense, and therefore, not discoverable. Overruling Hall's discovery motion, the trial court stated, in pertinent part:

> **Crim.R. 16(B)(1)(c) requires the disclosure of documents _material_ to the preparation of the defense. Material is defined as any thing "of such a nature that knowledge of the item would affect a person's decision-making process." Black's Law Dictionary (7 Ed. Rev. 1999) 991. _State v. Donnal_, Allen App. No. 1-06-31, 2007-Ohio-1632.**
>
> **The question to be answered, then, is whether the evidence the defendant says that the state is withholding is "material" such that the outcome of the proceeding would be unreliable without the disclosure. The standard is whether there is a reasonable probability-not the mere possibility-that, if the requested materials are disclosed to the defense the result of the proceedings might be different. See _State v. Mills_ (March 12, 2001) Butler App. No. CA99-11-198, unreported.**

(Mar. 14, 2008 JE, Doc. No. 54) (emphasis in original). _Mills_, cited by the trial court, applied the standard of materiality developed in _United States v. Bagley_ and adopted by the Ohio Supreme Court in _Johnston_. 12th Dist. No. CA99-11-198, at *4, citing _Bagley_ (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481; _Johnston_, 39 Ohio St.3d at 61. This was the same standard that the Appellate Court in _Nguyen_ applied de novo after determining that the trial court therein failed to apply this standard. 2004-Ohio-2879, at ¶19. Based upon our review of the trial court's judgment entry and the standard of materiality adopted in _Johnston_, we find that the trial court applied the correct standard of materiality under Crim.R. 16(B)(1); and therefore we review its decision with regard to discoverability of these items pursuant to Crim.R. 16(B)(1)(c) under an abuse of discretion standard. We, therefore, reject Hall's suggestion that materiality under Crim.R. 16 is always a question of law subject to de novo review. Neither _Nguyen_ nor any of the cases

upon which *Nguyen* relies support that conclusion. 2007-Ohio-2879. See, also, *Hesson*, 110 Ohio App.3d at 852 (appellate court applied de novo review of the law governing materiality under Crim.R. 16(B)(1)(f), a.k.a. the *Brady* rule, determined that the trial court applied the incorrect standard, but, nonetheless, affirmed finding a lack of prejudice to appellant); *State v. Linscott* (Aug. 22, 1995), 4th Dist. Nos. 94CA1633, 94CA1634, at *2 (after determining that the trial court improperly used the public records statute, R.C. 149.43, as a discovery tool instead of Crim.R. 16, appellate court conducted de novo review concerning the laws governing discovery).

{¶29} Accordingly, we must decide whether the trial court abused its discretion in overruling Hall's discovery motion. Crim.R. 16(B)(1) provides, in pertinent part, that the following information is subject to disclosure:

> **(c) Documents and tangible objects. Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state,** *and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial***, or were obtained from or belong to the defendant.**

> **(d) Reports of examination and tests. Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, made in connection with the particular case, or copies thereof, available to or within the possession, custody or control of the state, the existence of which**

**is known or by the exercise of due diligence may become known
to the prosecuting attorney.**

(Emphasis added). As the trial court found, this Court and several other appellate courts have found that the State complies with Crim.R 16(B)(1)(d) when it provides the defendant with a copy of the report containing the results of the test(s) completed. *State v. Gott* (June 28, 1990), 3d Dist. No. 2-88-19, at \*6 (laboratory notes not required), citing *State v. Jones* (July 14, 1980), 4th Dist. No. 1025; *State v. Cross* (1975), 48 Ohio App.2d 357, 360, 357 N.E.2d 1103; *State v. Goble* (1982), 5 Ohio App.3d 197, 198, 450 N.E.2d 722; *State v. Jenkins*, 174 Ohio App.3d 374, 2007-Ohio-7180, 882 N.E.2d 57, ¶15; *State v. Iacona* (Mar. 15, 2000), 9th Dist. No. CA 2891-M, at \*17; *State v. Robertson* (May 26, 1994), 5th Dist. No. 92-CA-21, at \*3. Therefore, we reject Hall's argument that the trial court misinterpreted Crim.R. 16(B)(1)(d), and we find that the trial court did not abuse its discretion in denying discovery of the entire BCI & I case file, laboratory protocols, software, macros, data files, STR frequency tables, and corrective-actions documentation pursuant to Crim.R. 16(B)(1)(d).

{¶30} With regard to Crim.R. 16(B)(1)(c), the trial court first noted that Hall was effectively attempting to use Crim.R. 16(B)(1)(c) as a "catch-all" to avoid Crim.R. 16(B)(1)(d)'s specific provision for reports of scientific testing. (Doc. No. 54). The trial court further determined that the documents requested by Hall were not "material" to his defense applying the definition of material adopted

by the Ohio Supreme Court in *Johnston*. (Id.). The trial court reasoned that the documents requested by Hall presented a *mere possibility*, not a *reasonable probability*, that if the documents—the software, macros, data files, STR frequency tables, corrective actions, and complete BCI & I "case file"—were disclosed, the result of the proceedings might be different. Hall's purported purpose of seeking these documents was to show that the DNA testing was unreliable. The trial court, however, determined that Hall's request was far too broad to be material for this purpose and granted discovery of only the chain of custody, accreditation of the BCI & I lab with regard to DNA testing, and the qualifications of the laboratory personnel. (Id.).

**{¶31}** After reviewing Hall's discovery motions and the trial court's judgment entry denying discovery of the aforementioned items, we cannot conclude that the trial court abused its discretion. Hall's request was overly broad, requesting the entire BCI & I case file. (Doc. No. 12). Crim.R. 16, however, "does *not* provide for what is often called 'full,' 'complete' or 'open file' discovery." *State ex rel. Steckman v. Jackson* (1994), 70 Ohio St.3d 420, 428, 639 N.E.2d 83 (emphasis in original). Hall was also provided a copy of the DNA testing report and the names and qualifications of BCI & I personnel involved in testing the evidence. (Doc. No. 52). Hall was provided access to the physical evidence itself, stored at BCI & I, which he could have independently tested. (Sept. 16-18, 2008 Tr. Vol. I at 107); (State's Ex. 11). Furthermore, Hall was able

to question the accuracy of the DNA testing through cross-examination of BCI & I personnel at trial. (Sept. 16-18, 2008 Tr. Vol. I at 109-57). Aside from all this, Hall's request was based upon speculation regarding what these documents might or might not have revealed and "[m]ere speculation does not meet the accused's burden to show that the withheld evidence is material" under Crim.R. 16(B)(1)(c). *State v. Rivas*, 121 Ohio St.3d 469, 2009-Ohio-1354, 905 N.E.2d 618, ¶14, citing *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶339; *State v. Jackson* (1991), 57 Ohio St.3d 29, 33, 565 N.E.2d 549, quoting *United States v. Agurs* (1976), 427 U.S. 97, 109-110, 96 S.Ct. 2392, 49 L.Ed.2d 342 ("'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense'"). For all these reasons, we cannot conclude that the trial court abused its discretion by finding these requested items immaterial to the defense and denying Hall's discovery motion.

{¶32} Hall's third assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. I

**HALL WAS DENIED DUE PROCESS OF LAW IN VARIOUS DISCOVERY VIOLATIONS THAT DEPRIVED HIM OF ANY ABILITY TO ADEQUATELY PREPARE A DEFENSE.**

{¶33} In his first assignment of error, Hall argues that the State committed various discovery violations all of which deprived him of due process of law. Hall argues several specific discovery violations, including: (1) the State's failure to

disclose DNA findings or actual data; (2) BCI & I's failure to preserve evidence of latent fingerprints on the plastic baggies; (3) the State's failure to turn over to the defense Hall's recorded statement to law enforcement; (4) the State's failure to disclose the existence of statements made by Hall at the scene; and (5) the State's failure to disclose recorded statements of Hall's co-defendants Thompson and Burge. Hall also argues that the trial court erred by failing to suppress statements he made prior to *Miranda* warnings.

**{¶34}** It is well-settled that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution.*" *Davis*, 2008-Ohio-2, at ¶338, citing *Brady v. Maryland*, (1963) 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (emphasis added). Favorable evidence under *Brady* includes both exculpatory and impeachment evidence, but the evidence must be both favorable and material before disclosure is required. Id., citing *Bagley,* 473 U.S. at 674. Evidence is material under *Brady* only if there exists a "reasonable probability" that the result of the trial would have been different had the evidence been disclosed to the defense. Id., citing *Kyles v. Whitley* (1995), 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490, quoting *Bagley*, 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id., citing *Johnston*, 39 Ohio St.3d 48, paragraph five of the syllabus. However, "[t]he Due Process Clause requires a

different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *State v. Geeslin*, 16 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶9, quoting *Arizona v. Youngblood* (1988), 488 U.S. 51, 57, 109 S.Ct. 333, 102 L.Ed.2d 281. With regard to such evidentiary material, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id., quoting *Youngblood*, 488 U.S. at 58.

{¶35} This Court will address each of these alleged deprivations of due process, beginning with the disclosure of actual DNA findings and actual DNA data.[3] Hall argues that the trial court's failure to disclose actual DNA findings or data deprived him of his right to due process of law. We disagree. As this Court has already found in assignment of error three above, these requested documents were not material to the defense as "material" is defined under Crim.R. 16(B)(1)(c). Material within Crim.R. 16(B)(1)(c) has the same meaning for purposes of *Brady* (which is incorporated into Crim.R. 16(B)(1)(f)); and therefore,

---

[3] As we noted in our discussion of Hall's third assignment of error, Hall's supplemental discovery request sought more than just a copy of the BCI & I DNA analysis report; instead, Hall requested: a complete copy of the BCI & I case file, a copy of the laboratory protocols, evidence of chain-of-custody, a list of the software programs used to conduct the DNA analysis, STR frequency tables, documentation of corrective actions for discrepancies, accreditation, and background information of BCI & I laboratory personnel. (Doc. No. 12). Our discussion here is directed at these additional items requested beyond a copy of the report, which *was* provided to Hall.

the trial court's failure to disclose this evidence was not a *Brady* violation either. *Nguyen*, 2004-Ohio-2879, at ¶19, citing *State v. Steen* (June 28, 1994), 4th Dist. No. 93CA490.

{¶36} Hall next argues that BCI & I's failure to preserve latent fingerprints found on the baggies of crack violated his right to due process of law. We disagree. This evidence is of the type identified in *Youngblood* as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S. at 57. Accordingly, Hall must show that law enforcement acted in bad faith. Id. at 58. Hall argues that, in this case, "the strong indicia of bad faith is in several forms," including governmental abuse of power, discovery obstruction, falsified and tampered evidence, and the isolation of BCI & I personnel. (Appellant's Brief at 22-23, 26). These allegations lack support from the record. As to the alleged discovery violations, this Court has found no discovery violation; and therefore, we reject this as a basis for finding bad faith. With regard to the existence of falsified or tampered evidence we find no support or citation to support for these bald assertions. With regard to BCI & I personnel being "isolated" from the defense, Gabriel Feltner, a forensic scientist in the biology DNA section at BCI & I, testified that he was instructed that all communication regarding the case should proceed through BCI & I's legal counsel because of legal action taken by Hall against BCI & I. (Sept. 16-18, 2008 Tr. Vol. I at 179-80). We find no bad faith for

this action. Furthermore, the physical evidence was available to Hall for independent analysis. (Id. at 107); (State's Ex. 11).

**{¶37}** Aside from all of this, the evidence presented at the hearing conducted by the trial court on Hall's motion to compel dispels Hall's allegations of bad faith. Rhonda Boston, a forensic scientist in the latent fingerprint section at BCI & I for over twenty years, testified that she examined the plastic baggies for fingerprints and located one or two partial latent fingerprints, but that these prints had insufficient ridge detail for comparison purposes. (May 27, 2008 Tr. at 22-24). Boston testified that she examined the baggies for prints that could be used for identification, not exclusion purposes, and that BCI & I does not perform exclusionary testing. (Id. at 24). Boston further testified that since the latent fingerprints contained insufficient ridge detail for purposes of identification, she did not photograph or otherwise preserve the fingerprints. (Id. at 29-30). After examining the baggies and determining that the fingerprints were insufficient for identification purposes, Boston testified that she gave the baggies to Gabriel Feltner for DNA analysis. (Id. at 35-36). Feltner testified that he swabbed the plastic baggies for DNA after receiving them from Boston, and that he swabbed the entire surface of the baggies because he was not otherwise instructed by Boston to avoid certain areas to preserve fingerprints. (Id. at 12-20).

**{¶38}** Under these circumstances, Hall has failed to demonstrate bad faith and the evidence presented at the motion hearing negates any purported "indicia"

of bad faith. Therefore, Hall was not deprived due process of law for the State's failure to preserve the latent fingerprint evidence found on the baggies of crack.

{¶39} Next, Hall argues that he was deprived of due process of law by the State's failure to turn over his recorded statement to law enforcement. We disagree.

{¶40} Prosecutorial violations of Crim.R. 16 result in reversible error only when the defendant demonstrates that: (1) the state's failure to disclose was willful; (2) disclosure of the information prior to trial would have aided the defense; and (3) the defendant suffered prejudice. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶131, citing *State v. Parson* (1983), 6 Ohio St.3d 442, 445, 453 N.E.2d 689.

{¶41} During trial, it was revealed that the State intended to use Hall's video-taped police interview with its last witness, even though a copy of the recorded interview had not been provided to the defense. (Sept. 16-18, 2008 Tr. Vol. II at 277). The State claimed that the DVD recording had inadvertently been left out of its discovery response. (Id. at 278). The trial court ruled that the State could not use the DVD at trial but allowed the State to use the officer's written summary of the interview, which *was* timely provided to the defense. (Id. at 279). The trial court also cautioned the State to only introduce evidence consistent with what discovery had been provided timely. (Id. at 280). The trial court specifically found that the State's failure to disclose the DVD was, at best, negligence. (Id. at

283). The trial court then granted Hall a continuance to further review his police interview. (Id. at 284).

{¶42} Hall has failed to demonstrate that the State's failure to timely disclose the DVD recording of Hall's police interview was willful, that its disclosure would have aided the defense, or that he suffered prejudice. *Jackson*, 2005-Ohio-5981, at ¶131, citing *Parson*, 6 Ohio St.3d at 445. The trial court specifically found that the State's discovery violation was not willful. Furthermore, since the DVD was excluded from evidence, we fail to see how Hall was prejudiced by its late disclosure. Aside from that, Hall cannot claim surprise from the contents of his own interview. In addition, Hall was granted a continuance to further review the DVD. Under these circumstances, we do not find reversible error from the prosecution's discovery violation. Hall has also failed to demonstrate how this discovery violation deprived him of due process of law.

{¶43} Hall further argues a deprivation of due process for the State's failure to disclose the existence of statements he made at the scene. We disagree.

{¶44} Crim.R. 16(B)(1)(a) provides:

**(a) Statement of defendant or co-defendant. Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect the copy or photograph any of the following which are available to, or within the possession, custody, or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney:**

**(i) Relevant written or recorded statements made by the defendant or co-defendant, or copies thereof;**

**(ii) Written summaries of any oral statement, or copies thereof, made by the defendant or co-defendant to a prosecuting attorney or any law enforcement officer;**

**(iii) Recorded testimony of the defendant or co-defendant before a grand jury.**

For purposes of Crim.R. 16(B)(1)(a), "statements" are either: "(1) a written statement actually signed, or otherwise adopted or approved, by a witness or party, (2) a mechanical recording of the witness' words or transcription thereof, or (3) a substantially verbatim recital of such statement in a continuous narrative form." *State v. Walters*, 10th Dist. No. 06AP-693, 2007-Ohio-5554, ¶52, citations omitted. "Statements" do not include an investigator's "own selections, interpretations, or interpolations." Id., citing *State v. Moore* (1991), 74 Ohio App.3d 334, 340-41, 598 N.E.2d 1224.

**{¶45}** The alleged discovery violation at issue here was a statement made by Hall to Burge directly after the search of 260 S. Pine Street. At trial, Officer Delong testified that Hall "* * * was saying to Mr. Burge, who was also there, he said, "You put that stuff out there; didn't you?" He goes, 'That stuff is yours.'" (Sept. 16-18, 2008 Tr. Vol. II at 257). According to Delong's testimony, this statement was neither recorded testimony before a grand jury nor an oral statement made by the defendant to a prosecuting attorney or a law enforcement officer. The

statement was made by Hall to Burge; and therefore, discovery was not required under Crim.R. 16(B)(1)(a) (ii) or (iii). Furthermore, Hall's remarks made at the scene are not "statements" as that term is defined for purposes of Crim.R. 16(B)(1)(a); and therefore, their disclosure under Crim.R. 16(B)(1)(a)(i) was not required. Moreover, this purported statement was no real surprise to the defense given that defense's theory of the case, aside from arguing the unreliability of the DNA evidence, was that the crack cocaine belonged to Burge, not Hall. In addition, Hall has not demonstrated that this evidence was favorable and material to his defense. Under these circumstances, we cannot find that withholding this evidence violated his due process rights under *Brady*.

{¶46} Hall further argues that he was deprived of due process of law by the State's failure to disclose recorded statements of Hall's co-defendants Thompson and Burge. We, again, disagree. Crim.R. 16(B)(1)(a) applies only to defendants or co-defendants. The Ohio Supreme Court has defined "co-defendant" for purposes of Crim.R. 16(B)(1)(a)(iii) as: "'[m]ore than one defendant being sued in the same litigation; or, more than one person charged *in the same complaint or indictment* with the same crime.'" *State v. Stojetz* (1999), 84 Ohio St.3d 452, 459, 705 N.E.2d 329, citing *State v. Wickline* (1990), 50 Ohio St.3d 114, 118, 552 N.E.2d 913 (emphasis in original). The Court of Appeals has applied this definition of co-defendant for purposes of Crim.R. 16(B)(1)(a)(i) & (ii) as well. *State v. Davis*, 5th Dist. No. 2003CA00198, 2004-Ohio-3527, ¶¶75-82; *State v.*

*Lawson* (Apr. 30, 2001), 12th Dist. No. CA99-12-226, at *8. Hall agrees that Burge and Thompson were not charged in the same indictment and were not charged with the same crime as he. Nonetheless, he argues that these circumstances are irrelevant for purposes of Crim.R. 16(B)(1)(a) disclosure. Based upon the aforementioned authorities, we disagree. We, therefore, find no discovery violation for the State's failure to disclose recorded statements made by Burge and Thompson. Furthermore, this Court has reviewed DVD copies of Burge's and Thompson's police interviews in their entirety and neither contains evidence material to Hall's defense. (Court's Exs. 1 & 2). Therefore, the State did not violate *Brady* by failing to disclose these interviews.

{¶47} Finally, Hall argues that he was denied due process of law when the trial court overruled his motion in limine to exclude statements he made during a custodial interrogation prior to *Miranda* warnings. We disagree.

{¶48} A motion in limine is a request, made in advance of the actual presentation of the evidence and usually prior to trial, that the court limits or excludes certain evidence which the movant believes is improper. *State v. Black*, 172 Ohio App.3d 716, 2007-Ohio-3133, 876 N.E.2d 1255, ¶11, citing *State v. Winston* (1991), 71 Ohio App.3d 154, 158, 593 N.E.2d 308. "The motion asks the court to exclude the evidence unless and until the court is first shown that the material is relevant and proper." *Black*, 2007-Ohio-3133, at ¶11. Since a trial court's decision on a motion in limine is a ruling to exclude or admit evidence, we

review the trial court's decision for an abuse of discretion that amounted to prejudicial error. Id., citing *State v. Yohey* (Mar. 18, 1996), 3d Dist. No. 9-95-46, citing *State v. Graham* (1979), 58 Ohio St.2d 350, 390 N.E.2d 805, and *State v. Lundy* (1987), 41 Ohio App.3d 163, 535 N.E.2d 664.

**{¶49}** At trial, Hall made a motion in limine to exclude evidence of: his invocation of his right to remain silent that he made during the police interview; his prior criminal record; being previously shot; and his lack of employment. (Sept. 16-18, 2008 Tr. Vol. II at 304-06). The trial court granted Hall's motion with regard to his right to silence and his prior record but denied the motion with regard to background information, such as his education and employment. (Id. at 308-09). The trial court subsequently excluded any reference to Hall being shot. (Id. at 319). Accordingly, the only pre-*Miranda* information that was admitted into evidence was testimony regarding Hall's education and employment. Collection of biographical information such as this, however, does not qualify as a "custodial interrogation" for purposes of *Miranda*. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶¶20-34 (information solicited included: arrestee's name, address, age, phone number, Social Security number, physical description, *employer*, *education*, and the names of his immediate family members); *Pennsylvania v. Muniz* (1990), 496 U.S. 582, 601-02, 110 S.Ct. 2638, 110 L.Ed.2d 528. Therefore, we cannot find that the trial court abused its

discretion by denying Hall's motion in limine with regard to this information nor can we conclude that the admission of this evidence was a due process violation.

{¶50} For all the aforementioned reasons, we find that Hall was not deprived of due process of law and, therefore, overrule his first assignment of error.

## ASSIGNMENT OF ERROR V

**THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶51} In his fifth assignment of error, Hall argues that his conviction was against the manifest weight of the evidence. Specifically, Hall argues that the State's prosecution for drug possession hinged on the claim that he moved crack cocaine from inside the house to the outside of the windowsill, but that it was not supported by proof beyond a reasonable doubt. Hall argues that the only evidence in support of that claim was inconclusive DNA evidence and the unreliable testimony of one police officer. The State disagrees and argues that the officer's testimony, in conjunction with the DNA evidence linking Hall to the drugs, was sufficient to prove that he possessed the drugs. As such, the State argues that Hall's conviction was not against the manifest weight of the evidence.

{¶52} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and

[determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.

{¶53} Hall was indicted for possession of crack cocaine in violation of R.C. 2925.11(A), (C)(4)(d), which provides:

> **(A) No person shall knowingly obtain, possess, or use a controlled substance.**
>
> **(4) If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of possession of cocaine. The penalty for the offense shall be determined as follows:**
>
> **(d) If the amount of the drug involved * * * equals or exceeds ten grams but is less than twenty-five grams of crack cocaine, possession of cocaine is a felony of the second degree, and the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the second degree.**

Possession is defined as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C.

2925.01(K). "Possession of drugs can be either actual or constructive." *State v. Cooper*, 3d Dist. No. 9-06-49, 2007-Ohio-4937, ¶25; *State v. Edwards*, 5th Dist. No.2004-CA-00060, 2004-Ohio-6139, ¶10. An individual has constructive possession "if he is able to exercise domination and control over an item, even if the individual does not have immediate physical possession of it." *Cooper*, 2007-Ohio-4937, at ¶25; *Edwards*, 2004-Ohio-6139, at ¶10. In order for "constructive possession to exist, "'[i]t must also be shown that the person was conscious of the presence of the object.'" *Cooper*, 2007-Ohio-4937, at ¶25, quoting *State v. Hankerson* (1982), 70 Ohio St.1d 87, 91, 434 N.E.2d 1362; *Edwards*, 2004-Ohio-6139, at ¶10.

**{¶54}** Ten witnesses testified at trial for the State. Jason Garlock, a police officer with the Lima Police Department ("Lima PD") since May 1999, testified that he was assigned as a drug investigator with the pro-active crime enforcement ("P.A.C.E.") unit during the summer of 2006. (Sept. 16-18, 2008 Tr. Vol. I at 40). Garlock testified that the P.A.C.E. targets enforcement of drug laws by utilizing confidential informants ("C.I.") and executing search warrants. (Id.). During the summer of 2006, Garlock was working in the two hundred block of South Pine Street (S. Pine St.) in Lima, Allen County, Ohio after a C.I. informed the police that he was able to purchase crack cocaine from a house at 261 S. Pine St. (Id. at 41). The C.I. informed law enforcement that he had purchased drugs from this location ten times in the last two weeks. (Id. at 42). The C.I. also informed police

that a black female was selling drugs within the residence, but if she did not have any drugs to sell, someone at 261 S. Pine St. would call, gesture, whistle, or yell to someone across the street at 260 S. Pine St., and a black male from 260 S. Pine St. would bring the drugs over to 261 S. Pine St. (Id. at 42-43). Garlock testified that he observed this scenario during a controlled buy conducted by the C.I. (Id.). According to Garlock, based upon that information police obtained a search warrant for 260 S. Pine St., which was executed by the Lima PD S.W.A.T. and P.A.C.E. units. (Id. at 44).

{¶55} Garlock testified that the warrant was executed around 1:42 p.m., and that he was a perimeter officer stationed on the northwest side of the residence. (Id. at 44-45). Garlock testified that his responsibility in executing the warrant was to collect and inventory seized evidence. (Id. at 45). Garlock identified several photographs admitted as exhibits for the State, including: State's exhibit 12 as a diagram of the inside of the residence at 260 S. Pine St.; State's exhibit 13 as the residence at 260 S. Pine St.; State's exhibit 15 as the residence's back bedroom where Hall and Adrienne Thompson were located; State's exhibit 16 as a digital scale found in the back bedroom; State's exhibit 17 as the window air conditioner in the back bedroom; State's exhibit 18 as the two bags of crack cocaine that were placed on the windowsill; State's exhibit 19 as a shoe found in the back bedroom containing a baggie of crack; State's exhibit 20 as a close up of the inside of the shoe containing a baggie of crack; and State's exhibit 22 as a .40

caliber Ruger pistol found in an upper cabinet in the computer room located off of the living room. (Id. at 46-50); (State's Ex. 12, 13, 15-20, 22). Garlock also identified State's exhibit 1 as the firearm that was found loaded with four live rounds of ammunition and the safety off and State's exhibit 2 as a buccal swab obtained from William Burge. (Sept. 16-18, 2008 Tr. Vol. I at 50-51). Garlock testified that he obtained the buccal swab from Burge himself, and that the swab was used to collect DNA evidence. (Id. at 52). Garlock testified that State's exhibit 3 was a buccal swab he collected from Adrienne Thompson and State's exhibit 4 was a buccal swab Officer Ken Whitney collected from Hall in his presence. (Id. at 52, 54). Garlock further identified: State's exhibit 5 as the scale found on a table in the back bedroom; State's exhibit 6 as numerous cell phones located in the residence; State's exhibit 7 as the crack cocaine located on the windowsill; State's exhibit 8 as the baggie of crack found in the shoe; and State's exhibit 9 as a plastic bag that was taken from Hall's right rear pants pocket. (Id. at 55-58).

{¶56} Garlock further testified that some of the delay associated with the DNA testing was because BCI & I requested that standards from all persons found at 260 S. Pine St. be submitted for comparison to the DNA found on the plastic baggies containing crack cocaine. (Id. at 58). Garlock admitted that this delay was a result of a miscommunication on his and his team's part, due to the fact that Investigator Delong informed his team that he saw a black male's hand place the

baggies on the windowsill in the room where Hall was found. (Id. at 59). Garlock testified that based upon this information, and the fact that Hall was the only black male found in the room, that he swabbed Hall so that his DNA could be compared to that found on the baggies of crack. (Id. at 59-60).

{¶57} On cross-examination, Garlock testified that William Burge was walking back and forth between 260 and 261 S. Pine St., and that Burge was found at the location searched. (Id. at 60). Garlock testified that Investigator Delong took the photographs earlier identified. (Id. at 61). Garlock admitted that the firearm found at the residence was not found in the room with Hall and that no fingerprinting or DNA tests were conducted on the firearm. (Id. at 61-62). Garlock testified that law enforcement were acting on a tip that Burge was trafficking drugs for a main supplier and admitted that a crack pipe was found underneath Burge. (Id. at 63-64). Garlock further testified all three occupants were originally charged with keeping a disorderly house. (Id. at 64). Garlock testified that the crack cocaine found in the shoe was not immediately visible and that the shoe was not found on the bed as photographed in State's exhibit 20. (Id. at 65-67). Garlock also testified that the firearm was located in a high cabinet, so the photograph appears to be taken on an angle. (Id. at 68); (State's Ex. 22). Garlock explained that there was no picture of the baggies of crack while they were on the windowsill and that moving evidence before photographing it was not a general police practice. (Id. at 70-71). Garlock testified that the warrant

executed on 260 S. Pine St. was a "knock first" warrant, and so it was possible that people moved around in the house prior to law enforcement entering the house. (Id. at 72). Garlock further testified that he was immediately informed that a hand came out of the bedroom, but "it was substantially after that it was determined that it was a black male's hand from Investigator Delong." (Id. at 73). Garlock admitted that they could have taken photographs of the baggies of crack on the windowsill, but thought that the windowsill was too high and perhaps that was why the drugs were secured from inside the house. (Id.).

{¶58} Garlock further testified that $7,000 was found in a vehicle parked in front of the residence, but that a court, in a separate action, determined that the money belonged to Lille and Pequina Burge, not Hall. (Id. at 74-75). Garlock testified that none of the cell phones were tested for fingerprints and that none of the four cars found at the residence were registered to Hall. (Id. at 75-76). Garlock admitted that the photograph of the window air conditioner was not as it appeared when police entered the room; rather, the accordion-style vent was closed. (Id. at 77). Garlock further testified that no DNA swabs were taken from Lillie or Paquina Burge, Willie Helton, or any of Hall's, Burge's, or Thompson's relatives. (Id. at 78). Garlock admitted that no fingerprinting or DNA testing was performed on the crack pipe, and that he was unsure whether all the officers used latex gloves when collecting evidence, though they generally do wear gloves. (Id. at 79-80).

{¶59} On re-direct examination, Garlock testified that even though none of the vehicles found were registered to Hall, his girlfriend, Thompson, and he were the ones primarily driving the vehicles. (Id. at 81-82). Garlock also testified that the majority of the photographs showed the evidence as it appeared at the scene with the exception that the crack was removed from the windowsill before photographed. (Id. at 83). Garlock further testified that the search warrant was not for the sole purpose of arresting Burge but to collect evidence of drug trafficking. (Id.).

{¶60} Officer Kenneth Whitney, a Lima police officer for 31 years and an identification officer for 18 years, testified that his responsibilities as an identification officer were to collect prints at the crime scene, taking fingerprints from prisoners, photography, test-firing of weapons, and testing of marijuana. (Id. at 87). Whitney identified State's exhibit 4 as the buccal swab he collected from Hall on July 26, 2006 and identified Hall as the defendant in open court. (Id. at 88-89). Whitney testified that he placed the swab into a box, initialed the box, placed the box into a manila envelope, sealed it with tape, and placed the envelope into the Lima PD property room, where the evidence remained until it was transported to the lab for testing. (Id. at 89-90).

{¶61} Lindsey Hail testified that she was employed at the BCI & I lab in Bowling Green, Ohio as a forensic scientist in the forensic biology and DNA unit from January 2004 to September 2007, and that she has examined thousands of

evidence samples. (Id. at 92-93). Hail testified that she left BCI & I due to personal reasons, not due to any disciplinary action. (Id. at 93). The trial court qualified Hail as an expert in forensic DNA analysis. (Id. at 97). Hail testified that two DNA swab-samples were created for each of the two baggies of crack cocaine (four swab-samples in total). (Id. at 100). Hail testified that she analyzed DNA samples from Burge, Thompson, and Hall and compared these to the swab-samples collected from the two baggies. (Id. at 101-102). Hail identified the DNA samples taken from these three individuals as State's exhibits 2, 3, and 4, respectively. (Id.). Hail testified that the partial DNA profile obtained from the two baggies was consistent with Hall and *not* consistent with either Burge or Thompson. (Id. at 104). Hail testified that the probability associated with the DNA on the baggies being Hall's was 1 in 26,120,000; meaning that "if [she] were to test twenty-six million one hundred and twenty thousand people's DNA [she] would only expect to find one person that would match up with this partial profile that [she] found on [the] baggie." (Id. at 105). Hail also testified that she determined that the DNA found on the baggie was from one source and was not a mixture of several persons' DNA. (Id. at 106). Hail identified State's exhibit 11 as the report wherein she summarized her findings. (Id.). Hail further testified that her report indicated that the remaining portions of each item tested would be retained at BCI & I and were available upon request for independent analysis. (Id.

at 107). To Hail's knowledge, no independent analysis had ever been requested. (Id.).

{¶62} On cross-examination, Hail testified that, in addition to being commonly referred to as a forensic biologist, some have referred to forensic biologists as serologists. (Id. at 109). Hail testified that no serology test was done on the samples, though one could have possibly been done since two swab-samples were taken from the baggies. (Id. at 110). Hail testified that no serology was likely done since there was no indication that bodily fluids were found on the baggies. (Id.). Hail further testified that DNA can be transferred by sweat, blood, and even dead skin cells from dust, and that she could not say exactly how the DNA was left on the baggies only that it was found on the baggies. (Id. at 111-12). Hail testified that the amount of DNA obtained for testing from baggie number one was "much less than we target" and that the amount of DNA obtained for testing from baggie number two was "just under what we target." (Id. at 113). Hail explained that the targeted amount of DNA is 1.5 nanograms, and the tested amount was 1.49 nanograms for baggie two. (Id. at 114). Hail further explained that the targeted amount is not the minimum amount required for the DNA testing machine to operate correctly but the amount typically needed to get a full DNA profile. (Id.). Hail testified that this lower-than-targeted amount collected may be the reason only a partial DNA profile was obtained. (Id.).

{¶63} Hail also testified regarding the testing procedures, including that sometimes when the DNA is processed in a thermocycler a phenomenon called "stutter" can occur. (Id. at 115). "Stutter" occurs when multiple copies of a sample are created and some of the samples have one less unit than their copies, and stutter can be significant enough to show up as alleles, according to Hail. (Id. at 115-16). Hail also explained the phenomenon of "allelic drop-out," which can occur when insufficient amounts of DNA are collected. (Id. at 116-17). Hail testified that "background DNA," identified by defense counsel as "DNA all around everything that exists in life," may exist but is not identified as such in her profession. (Id. at 118-19). Hail agreed that possible contamination could occur from so-called "background DNA" and that it might be amplified in testing; however, she also testified that BCI & I has procedures in place to avoid unnecessary contamination. (Id. at 119-20).

{¶64} With respect to the tested samples, Hail testified that at locus D21S11, which she explained as location "S11" on chromosome 21, she identified an allele as "28." (Id. at 122). Hall's DNA had alleles "28" and "31," one of which came from Hall's father and one of which came from Hall's mother. (Id. at 122). Hail testified that she located "28" but that "31" was not detected either because it was not present or because it was below the standard reporting threshold. (Id.). Hail explained that "31" may have also not appeared due to allelic drop-out, but admitted that the sample might well have had two "28"s as

opposed to one "28" and one "31." (Id. at 123). Hail denied that she was ever instructed to not provide this information to the defendant. (Id. at 124). Hail testified that at D3S1358 a "15" was observed, but no DNA was detected at CSF1PO. (Id.). Hail further testified that of the sixteen locations tested, seven did not provide DNA, which might have been caused by allelic drop-out. (Id. at 125). Hail further testified that even if no "31" was detected, that the DNA sample could be consistent with Hall's profile because of allelic drop-out. (Id. at 126). Hail explained that, in order to account for the locations for which no DNA appeared, those locations were excluded from her statistical calculation regarding the likelihood that the sample was Hall's. (Id.). To Hail's knowledge, the DNA data generated from the testing was not provided to the defense nor had she been contacted by the defense about this information. (Id. at 138). Hail testified that BCI & I has a standard "stutter" correction of 10% used at each tested location. (Id. at 140). Hail also testified that she did not examine DNA from Helton, Lille or Paquina Burge, or Hall's brother's DNA. (Id. at 156). Hail admitted that the statistical information only accounts for unrelated individuals. (Id. at 157).

**{¶65}** Sergeant Glenn Crawford, a retired Lima police office with 23 years of service, testified that he was employed with the Lima PD during the summers of 2006 and 2007. (Id. at 161-62). During those final years of his career, Crawford was in charge of the police property room, which included responsibility for entering evidence and transporting evidence to BCI & I for testing. (Id. at 162).

Crawford identified State's exhibit 7 as what appeared to be crack cocaine, State's exhibit 4 as a buccal swab or DNA standard taken from Earl Hall, State's exhibits 2 and 3 as buccal swabs taken from Burge and Thompson, respectively. (Id. at 163-64). Crawford testified that each of these items of evidence were in his possession and placed into the property room. (Id. at 164-65). Crawford further testified that he took the evidence to BCI & I for testing, and that no evidence left his possession until he dropped it off at BCI & I. (Id. at 166).

{¶66} Gabriel Feltner, a forensic scientist in the biology DNA section at BCI & I, testified that the package (State's Ex. 7) containing the baggies of what appeared to be crack cocaine, was originally opened by Rhonda Boston for purposes of latent fingerprint testing. (Id. at 167, 169). After Boston performed testing, he obtained the evidence and tested it, then passed it to Scott Dombransky for further testing. (Id. at 169-70). Feltner testified that he thoroughly swabbed the baggies for DNA with two sterile moistened swabs and placed the swabs in the freezer. (Id. at 170). Feltner testified that he marked the envelopes containing the swabs with the case number, item number, his initials, and separate code for later testing. (Id.).

{¶67} On cross-examination, Feltner testified that the baggies appeared to be darkened with powder because Boston first tested the baggies for latent fingerprints. (Id. at 171). Feltner admitted that he did not see the baggies prior to Boston, but that Vicki Lilly entered the evidence into BCI & I's records. (Id. at

172). Feltner admitted that the two baggies could touch each other inside the K-pack when they were brought to him from Boston. (Id. at 173). Feltner testified that typically they prefer to have items separately packaged, but if the items are collected as one item, then that is how they arrive at BCI & I . (Id. at 174). Feltner admitted that it could be possible for DNA to transfer from one baggie to the next, and that he was unaware of how the evidence was stored prior to it arriving at BCI & I. (Id. at 174-75). Feltner further testified that he swabbed the entirety of the two baggies, and that he would generally do this after Boston tested for fingerprints. (Id. at 176). Feltner explained that if fingerprints were to be preserved he would not swab an area or the prints would be lifted and preserved. (Id. at 177). Feltner denied having any knowledge of the existence of fingerprint ridge detail on the baggies. (Id. at 178). Feltner advised that he was aware of a defense motion for public records relating to this case, and that he was instructed that all communication regarding the case should proceed through BCI & I's legal counsel. (Id. at 179-80).

{¶68} Investigator Timothy Goedde, a Lima police officer since 1992, testified that he was a member of the S.W.A.T. team that executed the warrant at 260 S. Pine St. on July 25, 2006. (Sept. 16-18, 2008 Tr. Vol. II at 201). Goedde testified that the executed warrant was a knock and announce warrant, and that the team waited twenty seconds, during which no one answered, before they entered the house. (Id. at 205-06). Goedde testified that he was the second team member

- 42 -

who entered the residence following Sergeant Chivalia. (Id. at 204, 208). Goedde testified that he observed a hallway which led to two bedrooms, but that he did not see anybody in the hallway or anyone go from bedroom to bedroom. (Id. at 207). Goedde also testified that, from his vantage point, he would have seen persons in the hallway or persons leaving one bedroom to go to another. (Id.). Goedde testified that persons moving in the residence would be an immediate threat he would have identified. (Id. at 208). On cross-examination, Goedde testified that he entered the home at a "controlled" pace equivalent to a "fast walk." (Id. at 209). Goedde admitted that any number of things could have occurred in the home prior to their entry during the twenty-second waiting period. (Id. at 210). Goedde further testified that he did not end up in the bedrooms where either Hall or Burge were found. (Id. at 210-11).

{¶69} Lieutenant Christopher Protsman, a Lima police officer for thirteen years, testified that he was a sergeant on the S.W.A.T. team that executed the warrant at 260 S. Pine St. on July 25, 2006. (Id. at 213-14). Protsman testified that: the warrant was executed at approximately 1:30 p.m.; it was a twenty-count warrant; and he was the fourth person to go inside the residence that day. (Id. at 214). Protsman testified that it took him approximately a second to enter the residence and get to the middle of the living room where he could see down the hallway to the bedrooms. (Id. at 216); (See State's Ex. 12). Protsman testified that he did not see anyone in the hallway, and that he thought the back bedroom door

was closed at that time. (Id. at 217). Protsman also testified that he was the first team member to enter the back bedroom, and he observed two people lying underneath a cover on a bed that was in the center of the room. (Id.). Protsman pulled the cover off them and ordered them to show him their hands and to roll over on their stomachs, at which time they were placed into handcuffs. (Id. at 219-20). In reference to the diagram, Protsman testified that Hall was lying on the left side of the bed and the female was lying on the right side of the bed. (Id. at 218). Both individuals were wearing clothing suitable for outdoors and both were awake when he entered the room. (Id. at 219). Protsman estimated that it took him about six seconds to reach the back bedroom after entering the residence. (Id. at 220). On cross-examination, Protsman confirmed that it took him about six seconds to reach the back bedroom. (Id. at 221). Protsman testified that he left the scene once the P.A.C.E. unit arrived. (Id.). He further testified that the individuals in the bedroom cooperated and did not struggle. (Id. at 221-22). Protsman could not recall who cleared the kitchen, the other bedroom, or the garage but testified that those areas would have been cleared by different team members. (Id. at 223). Protsman testified that he left the individuals in the custody of the P.A.C.E. unit. (Id. at 224).

{¶70} Scott Dobransky, a forensic scientist in the chemistry section at BCI & I for the past twenty six years, testified that he had been qualified as an expert in Allen County previously. (Id. at 224-26). Dobransky identified State's exhibit 7

as the plastic baggies containing white substance material, which he analyzed. (Id. at 226). Dobransky testified that, wearing gloves, he separated the contents from the baggies, keeping the contents of each baggie separate for testing. (Id. at 227). The first baggie contained 13.57 grams of white material; the second baggie contained five separate baggies collectively weighing 6.77 grams. (Id. at 228). Dobransky determined the substances in all the baggies was crack cocaine, and issued a report to that end, which he identified as State's exhibit 10. (Id. at 229-31).

{¶71} On cross-examination, Dobransky testified that, of the total eighteen rocks of crack cocaine in the first baggie, he tested eleven that he randomly-selected. (Id. at 232). Dobransky admitted that he did not test the remaining seven rocks from baggie one. (Id. at 233). From the second baggie, Dobransky tested seven randomly selected rocks from a total of nine; two were not tested. (Id.). Dobransky testified that the weight calculations included both the tested and untested portions. (Id.). Dobransky further testified that he performed a cobalt (bluing) test on one of the eighteen rocks. (Id. at 234). With regard to hexane testing, Dobransky testified that he tested all seven of nine and eleven of eighteen rocks. (Id. at 237). Dobransky testified that crack cocaine is made from powder cocaine, but denied that the crack cocaine could contain powder cocaine residue. (Id. at 239-41). Dobransky further testified that, prior to him receiving the baggies, Rhonda Boston tested them for fingerprints, and that Boston handed the

baggies directly to him following her testing. (Id. at 241-42). Dobransky also testified that the baggies were in one submitted evidence bag so they were likely touching each other. (Id. at 242). He further testified that he handled the evidence with gloves but did not change gloves between testing each baggie. (Id. at 243).

{¶72} Investigator Kevin Delong, a Lima police officer with over ten years of service, testified that he was a narcotics investigator with P.A.C.E. and participated in the July 2006 search of 260 S. Pine. St. (Id. at 244-45). Delong testified that he was assigned to watch the southwest perimeter of the residence to make sure no individuals attempted to escape. (Id. at 246). Delong testified that as he heard the S.W.A.T. team enter the residence, he heard a sliding noise behind him coming from a window-unit air conditioner. (Id. at 247-49). Delong testified that "[he] saw this accordion thing was open and a hand came out and put two bags of what looked to [him] like crack cocaine on the window ledge out here." (Id. at 249). Delong explained that the photographs of the house do not show the air conditioning unit since the photo was taken subsequent to the search when the air conditioner was no longer present. (Id. at 449-50). Delong testified that the window was just a little above his head, and that the hand he saw was the hand of a black male. (Id. at 250). Prior to the S.W.A.T. team entering the residence, there was nothing on the window ledge, according to Delong. (Id. at 251). Delong testified that the S.W.A.T. team's presence had caused several people from the neighborhood to gather around the area to see what was happening; so, as soon as

he heard the "all clear" from the S.W.A.T. team, he jogged into the back bedroom of the house, pushed open the accordion on the air conditioning unit, and collected the bags of crack. (Id. at 252). Delong explained that he did not take photographs of the crack where he located it because he wanted to take control of the evidence quickly so that people gathering in the neighborhood would not see it. (Id.). Delong testified that he gave the two baggies of crack to Sergeant Garlock, who was responsible for inventorying the evidence. (Id. at 254-55).

{¶73} Delong identified: State's exhibit 5 as the digital scale found on the end table in the bedroom; State's exhibit 6 as five cell phones that were found in the bedroom; State's exhibit 7 as the crack cocaine found on the windowsill; State's exhibit 8 as the bag of crack cocaine found in the shoe. Delong further identified several photographs: State's exhibit 15 as the southwest bedroom with the air conditioner with the accordion style slide open from when he collected the crack cocaine; State's exhibit 16 as the digital scale located on a night table in the bedroom; State's exhibit 17 as the air conditioner in the window where he located the crack cocaine; State's exhibit 18 as the crack cocaine he found on the windowsill; State's exhibit 19 as one of the black tennis shoes with a baggie of crack inside found on the floor in the bedroom between the bed and the air conditioner; and State's exhibit 21 as the money found on Hall's person. (Id. at 253, 255-58).

**{¶74}** Delong identified the defendant as the person he found in the back bedroom where he located the crack cocaine. (Id. at 257). Delong further testified that, when he moved Hall from the bedroom, Hall stated to Burge "You put that stuff out there; didn't you?" and "That stuff is yours." (Id.). Delong testified that he thought Hall was trying to get Burge to take the blame for the crack that was found on the windowsill. (Id.). Hall waived his right to cross-examine Delong. (Id. at 286-88).

**{¶75}** Sergeant Charles Godfrey, a Lima police officer for the past twelve years and a P.A.C.E. unit member for the past six years, testified that he participated in the July 25, 2006 search of 260 S. Pine St. (Id. at 311-12). Godfrey testified that he was stationed on the northeast perimeter of the house, close to the front porch entrance. (Id. at 312). Godfrey testified that he escorted Thompson and Hall out of the bedroom and onto a living room couch. (Id. at 313). Godfrey searched the four to five vehicles that were parked outside of the house, including a full-sized GMC Yukon with twenty-inch rims, a late seventies Bonneville with twenty-inch rims, a mid-nineties black Cadillac, a mid-to-late-seventies Cutlass, and an older white Cadillac. (Id. at 314). Godfrey testified that, after searching the vehicles, he transported Hall to the police station, where he went through booking and inventory. (Id. at 315-16). Godfrey identified State's exhibit 9 as a baggie that he removed from Hall at the house and State's exhibit 21 as $1,885.00 that he removed from Hall at the house. (Id. at 316.). Godfrey testified that he

interviewed Thompson, Burge, and Hall at the detective bureau of the Lima PD. (Id. at 317). Godfrey testified that around 6 p.m. on the same day, Sergeant Garlock and he interviewed Hall. (Id. at 317, 326). During that interview Hall informed law enforcement that: he had lived at 260 S. Pine St. for a couple months; he was currently unemployed and his last temporary job was about six months ago; he did brakes and mechanical work for about $35-$40 a job; and that these mechanical jobs were his only current source of income. (Id. at 326-27).

{¶76} Hall also told Godfrey and Garlock his version of what happened when the S.W.A.T. team entered his residence. (Id. at 327). Godfrey testified that Hall stated:

> * * * he was laying in bed, being the back southwest bedroom, with his girlfriend, Adrienne Thomas (sic). He said he was laying on his side, facing his girlfriend. The window in which the crack cocaine was found was behind him. * * * He said he was laying there when he said that William Burge came in the door and yelled that the police were going to come in this mother f*ck*r. Originally he said he ran out. Then we asked him more details. What he said was that he was laying on his side. * * * He said that as he was laying there that William Burge * * * came in and yelled something about police were coming and that William Burge ran over to the window behind him and that he heard a commotion and that he then ran out. We asked if he had made any movements or if he had just laid there. He said, "I just laid there. I lifted my head." He said about two minutes later the S.W.A.T. team then came into the room.

(Id.). Godfrey further testified that Hall stated that all of the vehicles were owned by either his cousin or brother but that everyone drives them. (Id. at 328). Godfrey testified that Hall indicated that the money found on his person was given to him

by a cousin, and then subsequently stated that the money was from several cousins. (Id. at 329). The street-value of the crack cocaine found at the residence was approximately $4,000.00 according to Godfrey. (Id. at 331-32). Godfrey described Thompson as "* * * a very small, very petite, very maintained – you know, hair done, make-up done, nails done. Everything about her was very neat, so to speak, or very pristine." (Id. at 332). Godfrey testified that he specifically remembered her nails being done. (Id. at 333).

{¶77} On cross-examination, Godfrey testified that law enforcement entered 260 S. Pine St. because Burge, who lived at that residence, was involved in a drug transaction. (Id.). Godfrey also admitted that none of the money given to the C.I. to purchase drugs matched money possessed by Hall or Burge. (Id. at 334-35). Godfrey testified that he was not aware whether or not Hall had a bank account or whether any of the money Hall possessed was drug money. (Id. at 335, 337). Godfrey also admitted that he was unaware of how much Hall paid in rent, utilities, or other bills at the residence, or whether Hall possessed this cash to pay those bills, but he thought this was a large amount of money to be carrying. (Id. at 337-39). Godfrey also testified that Burge was found with a crack pipe and that Burge was the individual involved a drug sale the day prior to the search. (Id. at 339). Godfrey testified Hall never stated that Burge put the crack on the windowsill, but that Burge "must have" put the crack there. (Id. at 340-41). Godfrey testified that Willie Helton admitted to putting the crack on the

windowsill the night before the search, and that Helton was indicted for putting crack on the windowsill. (Id. at 342). Godfrey further testified that they found no crack belonging to Burge, and that he did not think it was likely that Burge was putting his crack in the back bedroom. (Id. at 342). Godfrey also testified that he did not check to see if Hall had any tickets associated with any of the vehicles at the residence. (Id. at 343).

{¶78} On re-direct, Godfrey testified that no money was found on Burge. (Id.). Godfrey explained that it would be very time consuming to cross-reference Hall's money to all of the money used by C.I.s. (Id. at 344). All the paperwork for 260 S. Pine St. was in Hall's name. (Id. at 345). On re-cross, Godfrey testified that law enforcement entered the home because Burge sold drugs next door, but that they found no buy money on Hall. (Id. at 345-46). Godfrey also testified that Helton admitted to placing the drugs on the windowsill the night before. (Id. at 346). Godfrey testified that Helton was indicted "for * * * admitting that he placed these drugs on the windowsill the night before." (Id. at 347). Godfrey testified that Helton was not found during the search. (Id.).

{¶79} Godfrey was the State's final witness. Thereafter, the trial court admitted State's exhibits one to twenty-two. (Id. at 349-53). Hall made a Crim.R. 29 motion, which was denied, and then, rested his defense. (Id. at 353-56). The jury then found Hall guilty of possession of crack cocaine. (Sept. 16-18, 2008 Tr.

Vol. III at 420-21). A pre-sentence investigation was requested and the matter set for sentencing on October 27, 2008. (Id. at 424).

**{¶80}** Based upon the evidence presented at trial, we cannot conclude that Hall's conviction was against the manifest weight of the evidence. Delong testified that, during the S.W.A.T. team's search of 260 S. Pine Street, he saw a black male's hand reach out and place two baggies of a white substance— subsequently determined to be over twenty (20) grams of crack cocaine by BCI & I—on the back bedroom windowsill. Delong testified that Hall was found in this bedroom with his girlfriend Thompson. Hall was the only black male found in the bedroom. Furthermore, through further testing, it was determined that Hall's DNA was consistent with the DNA found on the plastic baggies of crack cocaine. The DNA found on the baggies was not consistent with either Thompson or Burge, the other two individuals found in the residence at the time of the search. Although the crack cocaine was not found on Hall's person, we believe that the evidence, viewed in its totality, demonstrated that Hall was able to exercise domination and control over it and that he was conscious of its presence. *Cooper*, 2007-Ohio-4937, at ¶25; *Edwards*, 2004-Ohio-6139, at ¶10; *Hankerson*, 70 Ohio St.1d at 91. For these reasons, we are not convinced that the jury clearly lost its way or created a manifest injustice that requires a new trial.

**{¶81}** Hall's fifth assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR IV

**THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN SENTENCING HALL TO A PERIOD OF 6 YEARS OF INCARCERATION.**

**{¶82}** In his fourth assignment of error, Hall argues that the trial court abused its discretion by sentencing him to six years imprisonment. Specifically, Hall argues that Helton, who was the admitted owner of the cocaine in question, was only sentenced to three years, even though his culpability was greater than Hall's who only allegedly moved the cocaine onto the window sill. The State, on the other hand, argues that the trial court did not abuse its discretion since it was not required to give the same sentence to Hall as it gave to Helton. The State further points out that Hall has prior criminal convictions and that his sentence is within the statutorily prescribed range of two to eight years. We agree with the State that the trial court did not err in sentencing Hall to six years imprisonment.

**{¶83}** A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record; the sentencing statutes' procedure was not followed or there was not a sufficient basis for the imposition of a prison term; or that the sentence is contrary to law.[4] *State v. Ramos*, 3d Dist. No. 4-06-24, 2007-Ohio-767,

---

[4] We note that the Supreme Court of Ohio recently released a plurality opinion in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, which established a two-part test utilizing both the clear and convincing and abuse of discretion standard of review in reviewing felony sentencing decisions under R.C. 2953.08(G). While we cite to this Court's precedential clear and convincing standard of review, which was affirmed and adopted by three dissenting Justices in *Kalish*, we note that the outcome of our decision in this case would be identical under the *Kalish* plurality's two-part test as well.

¶23 (the clear and convincing evidence standard of review set forth under R.C. 2953.08(G)(2) remains viable with respect to those cases appealed under the applicable provisions of R.C. 2953.08(A), (B), and (C) * * *); *State v. Rhodes*, 12th Dist. No. CA2005-10-426, 2006-Ohio-2401, ¶4; *State v. Tyson*, 3d Dist. Nos. 1-04-38; 1-04-39, 2005-Ohio-1082, ¶19, citing R.C. 2953.08(G).  Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus; *State v. Boshko* (2000), 139 Ohio App.3d 827, 835, 745 N.E.2d 1111.  An appellate court should not, however, substitute its judgment for that of the trial court because the trial court is "'clearly in the better position to judge the defendant's likelihood of recidivism and to ascertain the effect of the crimes on the victims.'" *State v. Watkins*, 3d Dist. No. 2-04-08, 2004-Ohio-4809, ¶16, quoting *State v. Jones* (2001), 93 Ohio St.3d 391, 400, 754 N.E.2d 1252.

{¶84} Prior to sentencing, the trial court stated that it had considered the evidence presented at trial, R.C. 2929.11-12, the pre-sentence investigation (PSI), oral statements, victim impact statements, and the need for deterrence, rehabilitation, incapacitation, and restitution. (Oct. 27, 2008 Tr. Vol. III at 438-40); (Oct. 27, 2008 JE, Doc. No. 212).  As indicated in the PSI and admitted by the defendant, the trial court found that Hall had been prosecuted as a juvenile in Allen County for robbery and sent to the Department of Youth Services (DYS).

(Oct. 27, 2008 Tr. Vol. III at 435-36, 439); (PSI). The trial court also noted Hall's prior criminal convictions, including: a curfew violation as a juvenile, two violations for operating a vehicle without an operator's license, improper lane change, underage consumption of alcohol, marked lanes violation, seat belt violation, visiting a disorderly house, obstruction of official business, driving under suspension, intoxication, operating a vehicle under the influence, public noise, disorderly conduct. (Oct. 27, 2008 Tr. Vol. III at 438-40); (PSI). Hall also had several charges filed against him, which were ultimately dismissed, including: underage consumption, domestic violence, disorderly conduct, littering, three driving under suspension violations, public noise, possession of cocaine, and keeping a disorderly house. (PSI). Under these circumstances, the trial court found under R.C. 2929.12(D) that Hall had not responded favorably to the previously imposed judicial sanctions. (Oct. 27, 2008 Tr. Vol. III at 439); (Nov. 27, 2008 JE, Doc. No. 212). The trial court also found that, given Hall's conduct and the amount of drugs involved, incarceration was appropriate and mandatory; additionally, the trial court found that Hall was not eligible for a community control sanction. (Oct. 27, 2008 Tr. Vol. III at 440).

{¶85} Hall has failed to clearly and convincingly demonstrate that the trial court's imposed six-year term of incarceration was in error. Hall compares his six-year sentence to Helton's three-year sentence and argues that his sentence was unreasonable, arbitrary, or unconscionable. We reject this argument. As the State

- 55 -

points out, there is nothing in the record regarding the facts and circumstances surrounding Helton's case, including the charge(s), details of a plea agreement, or Helton's prior criminal background. Additionally, even if Helton was a co-defendant, "[t]here is no requirement that co-defendants receive equal sentences." *State v. Wickham*, 5th Dist. No. CT2006-0084, 2007-Ohio-1754, ¶29, citing *State v. Lloyd*, 11th Dist. No. 2002-L-069, 2003-Ohio-6417, ¶21 and *United States v. Frye* (C.A.6, 1987), 831 F.2d 664, 667. See, also, *State v. Rivers* (Feb. 26, 1988), 3d Dist. No. 9-97-76, at *2. "Each defendant is different and nothing prohibits a trial court from imposing two different sentences upon individuals convicted of similar crimes." *Wickham*, 2007-Ohio-1754, at ¶29, citing *State v. Aguirre*, 4th Dist. No. 03CA5, 2003-Ohio-4909, ¶50. The trial court also found that Hall had not responded favorably to the previously imposed judicial sanctions. (Oct. 27, 2008 Tr. Vol. III at 439); (Nov. 27, 2008 JE, Doc. No. 212). After reviewing Hall's PSI, we agree with this finding; aside from that, the trial court is "'clearly in the better position to judge the defendant's likelihood of recidivism * * *'". *Watkins*, 2004-Ohio-4809, at ¶16, quoting *Jones*, 93 Ohio St.3d at 400. After reviewing the entire transcript of the proceedings, the trial court's sentencing hearing, and judgment of conviction, we cannot conclude that it erred by sentencing Hall to six years of imprisonment.

**{¶86}** Hall's fourth assignment of error is, therefore, overruled.

{¶87} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed.***

**ROGERS, J., concurs.**

**/jnc**


**WILLAMOWSKI, J., concurs separately.**

{¶88} I concur fully with the majority opinion, however write separately to emphasize that the appropriate standard of review was applied. In his fourth assignment of error, Hall alleges that the trial court abused its discretion in imposing a sentence of six years. Hall's appeal of his felony sentence was not pursuant to R.C. 2929.12, which, in my opinion would require an abuse of discretion standard. Thus, the standard used to review this case, as set forth in R.C. 2953.08(G) is the proper standard of review herein.